[No. S029490. June 28, 2010.]

THE PEOPLE, Plaintiff and Respondent, v.
DAVID EARL WILLIAMS, Defendant and Appellant.

406

412

COUNSEL

Lynne S. Coffin and Michael J. Hersek, State Public Defenders, under appointment by the Supreme Court, Jay Colangelo and Andrew S. Love, Assistant State Public Defenders, and Ellen J. Eggers, Deputy State Public Defender, for Defendant and Appellant.

Bill Lockyer and Edmund G. Brown, Jr., Attorneys General, Robert R. Anderson, Chief Assistant Attorney General, Pamela C. Hamanaka, Assistant Attorney General, John R. Gorey, Suzann E. Papagoda and Kenneth C. Byrne, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

**GEORGE, C. J.**—Defendant David Earl Williams appeals from a judgment of the Los Angeles County Superior Court imposing a sentence of death following his conviction by jury of (1) the first degree murder of Joanne Lacey (Pen. Code, § 187, subd. (a));[1] (2) robbery (§ 211); (3) arson causing great bodily injury (§ 451, subd. (a)); (4) kidnapping for robbery (§ 209, subd. (b)); and (5) kidnapping (§ 209, subd. (a)). In connection with the murder charge, the jury found true the special circumstance allegations that the murder was committed while defendant was engaged in committing the offenses of robbery and kidnapping (§ 190.2, subd. (a)(17)), and also found true a special circumstance allegation that the murder involved the infliction of torture. (§ 190.2, subd. (a)(18).) The jury also found true an allegation that defendant personally used a firearm in the course of the murder. (§§ 1203.06, subd. (a)(1), 12022.5.) Defendant admitted enhancement allegations, as to each count, that he had suffered one prior felony conviction for burglary (§ 459) and one prior prison term for rape (§ 261, subd. (a)(2)). (§§ 667, subd. (a), 667.5, subd. (a).) At the conclusion of the penalty phase of the trial, the jury returned a verdict of death. The trial court imposed a sentence of death on count 1, murder with special circumstances. The court imposed and stayed consecutive sentences of one year on the robbery count, nine years on the arson count, "imprisonment in the state prison for life with the possibility of parole" on the aggravated kidnapping count (§ 209, subd. (b)), one year eight months on the kidnapping count, five years for the firearm enhancement, five years for the prior felony conviction, and one year for the prior prison term. Defendant's appeal is automatic. (§ 1239, subd. (b).) We affirm the judgment in its entirety.

---

[1] Statutory references are to the Penal Code unless otherwise indicated.

# I. FACTS

A. *Guilt Phase Evidence*

The murder victim was Joanne Lacey, an African-American woman who resided in Altadena, and who was 42 years of age at the time of her death. Her husband, Napoleon Lacey, testified that his wife's habit was to return home from her work as a supervisor at the downtown Los Angeles branch of the United States Postal Service at approximately 7:30 or 8:00 p.m., but that on March 20, 1989, she failed to return home as usual. Eventually, he went out in search of her, accompanied by her mother. He noted that after work she sometimes stopped for groceries at a Boys Market in Pasadena. He added that his wife ordinarily wore several rings, a gold-and-diamond bracelet, and one or more necklaces.

Luis Martinez, a mailroom clerk at Mrs. Lacey's place of employment, testified that at approximately 7:00 or 7:15 p.m. on March 20, 1989, he accompanied Mrs. Lacey to the employee parking lot to see her new, dark-blue Volvo automobile. He observed her drive away from the parking lot. Another coworker, Faye Swain, testified that she encountered and spoke with Mrs. Lacey at the Pasadena mall, near the J.C. Penney store, between approximately 7:40 and 8:00 p.m. the same evening.

Another witness, Shirley Bobbe, testified that at approximately 8:00 p.m. on March 20, 1989, she was parked in front of the Boys Market in Altadena, loading groceries into her vehicle, when she observed a dark-blue Volvo driven by a middle-aged African-American woman begin to back out of a parking space. When Bobbe was ready to depart and began backing out of her parking space, she noticed that the dark-blue Volvo had not backed farther out of its spot.

At 9:45 p.m. on March 20, 1989, a $200 cash withdrawal from Mrs. Lacey's bank account was made at the automated teller machine at the Orangewood Shopping Center on California Boulevard in Pasadena.

Mrs. Lacey's friend Carrie Runnels testified that at approximately 10:30 p.m. on March 20, 1989, she received a telephone call from Mrs. Lacey. Mrs. Lacey seemed excited or rushed, and requested a loan of $500, stating that she had had an accident. She directed Mrs. Runnels to come alone to "Palm and Loma Alta" Streets in Altadena. When Mrs. Runnels stated that she would bring her husband along, Mrs. Lacey objected, instructing her to come alone. Mrs. Runnels drove a block and a half from her residence in Altadena when she observed a parked vehicle displaying blinking lights. The vehicle then followed Mrs. Runnels, who pulled over. The vehicle, which was

Mrs. Lacey's new dark-blue Volvo, pulled up next to Mrs. Runnels and stopped. Mrs. Lacey was in the passenger seat. She silently extended her hand towards Mrs. Runnels, who gave her $500. Mrs. Lacey passed the cash toward the driver and appeared to be sad. Mrs. Runnells asked whether Mrs. Lacey was all right and received an affirmative response. The Volvo departed, driven by a person with shoulder-length black hair.

Prosecution witness Troy Cory, a resident of Pasadena, testified that at approximately 11:00 p.m. on March 20, 1989, he heard some yelling outside his residence. He heard two or three gunshots or firecracker explosions, then heard someone call "let's get out of here" or "get in there." After hearing loud noises from a vehicle being driven away, he heard a loud explosion and observed a fireball rise toward the sky. He ran outside and saw that a vehicle was burning and that a firearm and some money were lying in the street.

Firefighters responded to the scene described by Cory, at approximately 11:30 p.m. on March 20, 1989. They observed a vehicle burning, with flames reaching four feet high. A fire spread down the street from a source located under the vehicle, probably gasoline. After approximately 15 or 20 minutes the firefighters were able to extinguish the blaze. When Pasadena Fire Department firefighter Robert Taylor opened the ruined vehicle's trunk by means of a sledgehammer, he observed a human body inside.

At the scene, Pasadena Police Officer Jayce Ward observed a .22-caliber revolver in the street near the vehicle, with two expended rounds and one unexpended round. The victim's body could be observed from the vantage point of the rear passenger compartment, because the backseat of the vehicle had been consumed by flames. Pasadena Police Department police assistant Susan Rogers testified that located in the front of the vehicle were a handbag, a bag of groceries from Boys Market, and a bag of children's clothing in a J.C. Penney bag. Also on the grass near the vehicle was a spout from a gasoline container. Nearby were a gas cap, a $20 bill, and a gold chain necklace.

The victim's charred body was lying facedown in the trunk of the Volvo, with her hands under her body. There were no rings on the victim's hands. It appeared that the fire had burned away the victim's clothing except for some buttons that had melted to the skin. A briefcase located under the body contained papers belonging to Joanne Lacey. It appeared that a burn on the victim's forehead had consumed the flesh and reached the skull. One arm was burned to the bone. There were burns on much of the body, and there was a .22-caliber bullet located in the victim's left hand.

Dr. Susan Selser, a pathologist employed by the Los Angeles County Department of Coroner, testified that an autopsy disclosed that Mrs. Lacey

had been alive when the fire started, and died from smoke inhalation and burns. Dr. Selser believed that the victim had been alive for up to 10 minutes during the fire, adding that the gunshot wound to the left hand occurred prior to death. There was also bruising to the neck, indicating compression prior to death.

Dr. William Davies, a surgeon specializing in burns, testified concerning the "all-consuming" and "excruciating" pain that the victim suffered as a result of burns, smoke inhalation, and suffocation. He believed she had endured the pain for at least four or five minutes, and perhaps for as long as 15 minutes. He observed soot in her lungs, esophagus, and gullet. He believed that more than 90 percent of the victim's body suffered third-degree burns.

Pasadena Fire Department investigator Robert Eisele inspected the burned Volvo and found burn patterns along the left side of the vehicle, also finding indications that the driver's side door had been open at the time of the fire. The roof of the vehicle had begun to cave in from the heat of the fire, and the sunroof had been consumed. The vehicle smelled of gasoline, and later tests confirmed there was gasoline on the mats. The passenger compartment showed severe burn patterns. The fire had burned through the passenger compartment into the trunk. The right side of the trunk, where the victim's head was positioned, suffered severe fire damage. The victim's forehead had adhered to the fender well. One taillight had been destroyed by fire. In the passenger compartment, the seats had burned away and the windshield had melted. The engine compartment, however, was intact, including various rubber hoses and insulated electrical wires. There were no electrical shorts, and the gasoline tank had not caught fire.

Eisele was of the opinion that someone had set the fire intentionally by pouring gasoline into the passenger compartment or possibly into the trunk, and lighting the fuel with a match or cigarette lighter. He believed that the person who set the fire may have suffered a burn to the hand, because it appeared to Eisele that the gasoline vapors had exploded when the fire was ignited.

On March 24, 1989, Detective John Knebel, a homicide investigator in the Pasadena Police Department was informed by a caller, John Wright, that Wright's daughter had information concerning the case. Wright's daughter informed Knebel that Margaret Williams (who had a child by defendant's brother) had spoken to Wright's daughter about Williams having been paid to purchase gasoline and to serve as a lookout while someone burned up an automobile. Knebel found that Margaret Williams had an outstanding warrant for her arrest on assault charges. He arrested her the following day and interrogated her. He arrested defendant soon thereafter.

By contrast, at trial, Margaret Williams (hereafter referred to as Williams) offered a different account of her activities. She testified under a grant of immunity, and the defense chose not to cross-examine her. She explained that an acquaintance, Loretta Kelley, arrived at Williams's residence in the early morning hours of March 21, 1989. Kelley informed Williams that defendant had something to tell her. When defendant entered Williams's residence, he smelled of gasoline and had a shirt wrapped around one hand. He went to the kitchen and wiped his hand, neck, and ankle with grease. Williams observed burns on his hand. Defendant removed approximately $600 or $700 in denominations of $20 and $100 from his pocket, along with some jewelry— two rings, a bracelet, and a necklace. When Williams asked him what had happened, he responded that he had "robbed a bitch," adding, "I burnt the bitch up." He informed her that he had been involved in an automobile collision with the victim, who had wanted to summon the police. Defendant said he told the victim that he would retrieve his driver's license from his vehicle, but instead returned with his firearm. He forced her into the passenger seat of her automobile, and drove aimlessly for awhile. He subsequently directed the victim to withdraw cash from an automated teller machine, then picked up Loretta Kelley. The victim begged for her life. At his demand, she telephoned a friend to request that she bring $500 to a location in Altadena. Defendant reported to Williams that he gave Kelley $50 to "watch out," and paid another person $100 to procure $2 of gasoline. He and Kelley set the victim's vehicle on fire, and during the process defendant suffered burns.

Williams testified that she observed defendant give Kelley a gold necklace. It appeared to Williams that Kelley was frightened. Kelley informed Williams that she had driven around with defendant and the victim. Williams asked the two to leave, and gave them a ride in her automobile to separate destinations. Two days later, while Williams and a friend were standing in a public place near other persons, Williams discussed what she had heard.

Defendant was arrested in front of his residence at approximately 1:30 p.m. on March 25, 1989. When he was arrested, he was driving his red Chevy Vega and wore black shoulder-length hair. Detective Knebel observed evidence of collision damage to the rear of defendant's automobile. A .22-caliber live round of ammunition was recovered from defendant's residence.

Los Angeles County Sheriff's Department criminalist James Bailey examined a fragment of the victim's blue Volvo and was of the opinion that the red marks on the fragment could have come from defendant's red Vega. California Highway Patrol Sergeant Jon West, who was an expert in accident reconstruction, was of the opinion that damage to and markings on the rear of defendant's Vega and the front, passenger-side bumper of the victim's Volvo

were consistent with a very low-speed collision occurring at a slight angle. On the Volvo, the front, passenger-side bumper was scuffed, and the lens for the turn signal was missing. Red paint marks on the outer, right edge of the headlamp lens corresponded to damage to the rear of the Vega near the license plate. The rear end of the Vega also had unrelated damage.

After his arrest, defendant made four statements to the police. With minor omissions, all four were admitted in evidence. The first statement was made in the course of a tape-recorded interview conducted on the day of his arrest, Saturday, March 25, 1989, by Detectives Knebel and Lionel Salgado, also a homicide investigator in the Pasadena Police Department. Defendant denied all knowledge of the crime during this interview. In the second statement, also tape-recorded, and taken on Monday, March 27, 1989, by Knebel, defendant explained that he had recently purchased his vehicle in a damaged condition, and he offered an alibi covering the time of the murder, involving a person named "Macho Man." During the third interview, conducted on Tuesday, March 28, 1989, after Knebel had inspected marks on defendant's left hand and ankle that suggested he had suffered burns, and the officer had shown the marks to a physician and photographed them, defendant asked to speak to Knebel. In a statement that was not tape-recorded but that occurred in the presence of two additional officers, defendant informed Knebel that Loretta Kelley had picked him up in a blue Volvo, but when she admitted that the vehicle was stolen he panicked, because he was on parole. He and Kelley agreed that the only way to remove defendant's fingerprints was to burn the vehicle. They poured gasoline on the automobile, and he was burned when they started the fire. The two of them proceeded to Margaret Williams's residence to treat the burns. Kelley had a large amount of cash and some jewelry in her possession. Defendant took a bracelet from Kelley but later disposed of it in a storm drain. Knebel testified that a bracelet identified by Napoleon Lacey as belonging to the victim was recovered by the police at the location described by defendant.

In a fourth interview, conducted by Knebel and Salgado in the afternoon of March 28, 1989, and tape-recorded for the most part, defendant repeated much of his earlier statement and claimed he first learned from a news article that there was a body in the trunk of the vehicle. Salgado asked why a firearm was found at the scene. Defendant acknowledged that the weapon belonged to him and began to weep. He admitted robbing the victim, taking her car, and forcing her to withdraw cash from an automated teller machine. He blamed Kelley for forcing the victim into the trunk of the vehicle and for shooting her. He acknowledged that he had assisted in sprinkling gasoline on the automobile. He claimed that Kelley ignited the fire before he was ready, causing him to suffer burns.

The defense did not present evidence at the guilt phase of the trial.

B. *Penalty Phase Evidence*

The prosecution introduced evidence of defendant's 1983 conviction for residential burglary and rape, and his 1981 conviction for attempted burglary. In addition, the court admitted portions of the tape-recorded statement of March 25, 1989, that had been deleted for the purpose of the guilt phase of trial. In this portion of his statement, defendant discussed his prior prison term for burglary and rape, explaining that he and his crime partner broke into the victim's home and that they were apprehended when his crime partner confessed.

The victim of the rape, R.T., testified concerning the circumstances of the crime. She had retired to bed for the night when defendant dragged her from her bed, beat her with a "huge stick," and sodomized and raped her, repeatedly calling her "bitch" during the sexual assaults. She testified that defendant then directed his crime partner to rape her. The man declined, but when defendant insisted, tried to comply but was unable to achieve an erection. Defendant's accomplice whispered to her that he had not stolen the money hidden in her Bible and apologized for what he was doing, stating, "I really don't want to do this. He's crazy. Do whatever he says 'cause he'll kill you."

R.T. testified that defendant bound her with a telephone cord and appeared to enjoy brutalizing her. When she complained she could not breathe, he stuffed a sock down her throat. He poured orange juice over her to "get rid of fingerprints." The men departed in her Mercedes automobile. In addition to injuries caused by the rape, she suffered a broken nose, black eyes, and bruises all over her body as a result of the attack. After the crime, she sold her residence, left her employment as a record producer, and moved away from the area.

Defendant's crime partner in the rape, Shelby Fulcher, testified against defendant at the penalty phase of the trial. He related substantially the same circumstances described by the rape victim. He was arrested three days after the crime, confessed, pleaded guilty, and was sentenced to a 10-year term in prison. He expressed remorse at the time of his confession.

Terry Robinson, a sergeant in the Los Angeles County Sheriff's Department, testified that when she responded to the rape scene, it appeared that R.T. had been beaten with a portion of a tree branch. Susan Lawton, also a sergeant in the Los Angeles County Sheriff's Department, testified that when she interrogated defendant concerning the crime, he waived his constitutional rights, signed an admonition form, and denied any involvement in the crime. He claimed that Fulcher came to his residence to request assistance in

disposing of a Mercedes automobile and other items of property. Defendant denied knowing anything about the property. When Lawton informed defendant that Fulcher had implicated him, defendant terminated the interview, stating he wanted to "think about it." An hour later, defendant asked to speak with the officer, who reminded him of his constitutional rights. Defendant claimed the crime was Fulcher's idea, asserting Fulcher had committed the rape and violent assault on the victim. Defendant admitted hitting the victim with a stick and tying her up. He admitted pouring orange juice on her and placing a sock in her mouth.

In addition, the prosecution presented evidence concerning the impact of Mrs. Lacey's murder on her mother, sister, and daughter. Mrs. Lacey's daughter had been 13 years of age at the time of her mother's death; she described how the trauma of the loss led her to experience anger and to misbehave at school. Her father, who initially informed her that her mother had died in an automobile accident, placed her with a relative. Some time prior to the trial he disclosed to her the exact circumstances of her mother's death, leading to a psychological breakdown for the young woman.

Mrs. Lacey's mother had resided with the victim and was close to her; her daughter's death caused her anxiety, confusion, and sleepless nights. The victim's sister described her sister's kindness and her terror of violence and firearms.

The defense presented the testimony of defendant's wife, Evangeline Williams. She testified that defendant's parents were drug abusers and that his mother had died of a drug overdose that may have been intentional. Defendant had four brothers and two sisters, and there was a period when all of defendant's siblings were incarcerated at the same time. When defendant's mother died, the children were sent to reside with an abusive aunt whom defendant attacked with a hammer. Defendant's grandmother eventually took in her grandchildren, but was hateful and did so solely for the welfare money she would receive for their care. Evangeline Williams characterized defendant as a childlike person who had low self-esteem. In her view, defendant was a talented artist, and she identified several paintings as defendant's work. She asked the jury to spare his life.

A consultant who had worked in the correctional system for many years also testified for the defense, describing the intense security surrounding prisoners who are sentenced to life in prison without the possibility of parole, and adding a description of the living and working conditions experienced by such inmates. He also described some of the amenities available to such prisoners, including access to television, library books, family visits, and exercise.

Psychiatrist Claudewell Thomas testified that he diagnosed defendant as having borderline personality disorder. He noted scars on defendant's shoulders, and concluded they may have been caused by abuse suffered by defendant as a child. He characterized defendant as being filled with rage, but the witness believed defendant would not be a danger to others in a structured setting. Dr. Thomas had not reviewed defendant's prison records but was not surprised to learn he had been diagnosed with antisocial personality disorder. In Dr. Thomas's view, both disorders arose from childhood abuse.

## II. DISCUSSION

### A. *Asserted Errors Affecting the Guilt Phase of the Trial*

#### 1. *Admissibility of Defendant's Statements*

Defendant claims that the four statements he made to the police following his arrest were obtained in violation of *Miranda v. Arizona* (1966) 384 U.S. 436 [16 L.Ed.2d 694, 86 S.Ct. 1602] (*Miranda*) and were involuntary. His argument on appeal relies in principal part upon the circumstances of his first interrogation, but he also refers to the subsequent interrogations. He asserts that the admission of his statements into evidence constituted a violation of rights secured by the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution, and that the error requires reversal of his conviction and sentence of death.

##### a. *Procedural background*

As noted, defendant was interviewed by the police on four occasions. At the first interview, conducted on Saturday, March 25, 1989, the day of defendant's arrest, Detectives Knebel and Salgado advised defendant of his rights pursuant to *Miranda* and at two points during the interview asked clarifying questions with respect to possible invocation of defendant's rights. The officers engaged in vigorous questioning, including references to the death penalty and to incriminating evidence that the officers did not possess, and repeated exhortations to defendant to tell the truth. Defendant steadfastly denied participation in the crimes.

The second interview occurred on Monday, March 27, 1989, when Knebel posed some questions concerning the damage to defendant's vehicle and other matters, without readvising defendant of his rights under *Miranda*.

The third interview occurred on Tuesday, March 28, 1989, after Knebel noticed possible burn marks on defendant's left hand and ankle, had the marks examined by a physician, and photographed the marks. Defendant

subsequently requested to speak to Knebel, and, after being reminded of his rights to counsel and to remain silent, gave a statement admitting he was present in the victim's vehicle with Kelley and participated in burning it, but denying any contact with the victim. He agreed to give a tape-recorded statement to Knebel and Salgado that afternoon.

In the ensuing fourth interview, after an advisement of and waiver of *Miranda* rights, he repeated the assertions he had made during the third interview, but ultimately admitted robbing and kidnapping the victim. He asserted that Kelley shot the victim and placed her in the trunk of the vehicle.

On August 7, 1992, the People filed a motion in the trial court pursuant to Evidence Code section 402, seeking a ruling on the admissibility of defendant's statements to the police. The People sought to anticipate and counter potential arguments that, at the outset of the first interrogation, the officers erred in posing clarifying questions during their *Miranda* advisement, that they failed to honor a subsequent invocation of rights, and that they did not renew the *Miranda* advisement prior to the second interrogation. With respect to potential claims regarding voluntariness, the People sought to counter anticipated assertions that the officers' references to the death penalty during the first interrogation, or exhortations to tell the truth during the third interrogation, were coercive.

The court conducted a hearing at which Knebel and Salgado testified. Knebel testified that defendant seemed cocky during the first interview, but was more subdued during the remaining interrogations. Knebel testified that at the outset of the first interview, defendant seemed to understand his rights, but was confused concerning the availability of counsel. Defendant appeared to understand the officers' explanation and displayed eagerness to speak with them. The officers testified they had not at any time offered defendant a reduced sentence in return for his cooperation, and they denied supplying defendant with any of the information he mentioned in the course of his statements, or making off-the-record threats or promises to defendant.

Defendant testified at the hearing that he had been subjected to multiple interrogations other than those recorded by the police, that he repeatedly had invoked his rights to remain silent and to counsel, and that prior to the second interrogation the officers promised he would receive a prison sentence of no more than 18 years if he admitted participation in the crimes and implicated other persons. Defendant testified he merely repeated the statements the officers had directed him to make. He claimed to have had no involvement whatsoever in the crime. He explained he made the statements in order to secure the promised 18-year sentence and to obtain revenge upon Kelley, but also because he wished to learn a new trade in prison.

At the conclusion of the testimony, defense counsel argued that defendant's incriminating statements had been coerced in the manner outlined in defendant's testimony.

In response, the prosecutor pointed out that she had filed a trial brief seeking to rebut anticipated defense claims based upon the officers' *Miranda* advisement and their statements concerning the death penalty, but that defense counsel had not addressed such claims in his argument. The prosecutor contended that defendant was not subjected to coercion.

The trial court commented that neither the taped and transcribed interviews nor the testimony of the witnesses provided any indication that defendant had been subjected to psychological or physical coercion. "He freely banters back and forth with the investigating officers. He carefully exonerates himself when it is appropriate. And on the stand, when he talked about the second statement, that doesn't coincide with what he said [in the taped second interview]." The court pointed out that in the second statement, far from implicating other persons, as defendant claimed he was directed to do by the officers, he merely offered an alibi. The court concluded that, "with those findings, and the court reading the moving papers of the People," the officers' mention of the death penalty during the first interview was not coercive. In addition, the court declared, "the fact that defendant was not advised on the second statement I don't find fatal to the statement. The first statement, the second and third statement is a continuing investigation. And on the third statement again he was advised, freely and voluntarily gives up his rights. And in those phases of the interrogation where he talked about asking for his attorney [i.e., the first interrogation], he goes right on and says he will talk to him. [¶] Again, I find no evidence of physical or psychological coercion. I find the defendant's statements . . . were freely and voluntarily made with no coercion on behalf of the officers, that his rights under *Miranda* are not violated in any way."

### b. Miranda *claims*

Defendant arguably forfeited his claims based upon *Miranda, supra,* 384 U.S. 436, because he did not raise them in the trial court. (See *People v. Rundle* (2008) 43 Cal.4th 76, 116, 121 [74 Cal.Rptr.3d 454, 180 P.3d 224], disapproved on other grounds in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22 [87 Cal.Rptr.3d 209, 198 P.3d 11].) The hearing conducted to determine the admissibility of the statements was held on the People's motion. At the hearing, defense counsel did not argue that the officers had violated rights secured by *Miranda.*

On the other hand, the prosecutor's motion and argument to the court brought certain elements of the *Miranda* claim before the court, including the

possibility that defendant had invoked his right to counsel at the outset of the first interrogation, and that his waiver of rights on that occasion was involuntary because of the officers' mention of the death penalty. Defendant testified at the hearing that he "continually" invoked his right to counsel during several days of interrogation, but that his invocation was disregarded. And the prosecutor elicited testimony from her own witnesses concerning the *Miranda* advisements and the circumstances of defendant's waiver of those rights, including defendant's demeanor as observed by the interrogating officers. The trial court ruled that no *Miranda* violation had occurred.

Assuming, without deciding, that defendant's claims were preserved, we conclude they lack merit, as we shall explain.

█ The basic rules applicable to defendant's claims are well settled. The high court has stated in summary that to counteract the coercive pressure inherent in custodial surroundings, "*Miranda* announced that police officers must warn a suspect prior to questioning that he has a right to remain silent, and a right to the presence of an attorney. [Citation.] After the warnings are given, if the suspect indicates that he wishes to remain silent, the interrogation must cease. [Citation.] Similarly, if the suspect states that he wants an attorney, the interrogation must cease until an attorney is present. [Citation.] Critically, however, a suspect can waive these rights. [Citation.] To establish a valid waiver, the State must show that the waiver was knowing, intelligent, and voluntary under the 'high standar[d] of proof for the waiver of constitutional rights [set forth in] *Johnson v. Zerbst*, 304 U.S. 458 [82 L.Ed. 1461, 58 S.Ct. 1019].'" (*Maryland v. Shatzer* (2010) 559 U.S. ___, ___ [175 L.Ed.2d 1045, 130 S.Ct. 1213, 1219].)

"The prosecution bears the burden of demonstrating the validity of the defendant's waiver by a preponderance of the evidence." (*People v. Dykes* (2009) 46 Cal.4th 731, 751 [95 Cal.Rptr.3d 78, 209 P.3d 1]; see *Berghuis v. Thompkins* (2010) 560 U.S. ___, ___ [176 L.Ed.2d 1098, 1112, 130 S.Ct. 2250].) In addition, "[a]lthough there is a threshold presumption against finding a waiver of *Miranda* rights [citation], ultimately the question becomes whether the *Miranda* waiver was [voluntary,] knowing[,] and intelligent under the totality of the circumstances surrounding the interrogation." (*People v. Cruz* (2008) 44 Cal.4th 636, 668 [80 Cal.Rptr.3d 126, 187 P.3d 970].) On appeal, we conduct an independent review of the trial court's legal determination and rely upon the trial court's findings on disputed facts if supported by substantial evidence. (*People v. Dykes, supra*, 46 Cal.4th at p. 751.)

### i. *Initial waiver of* Miranda *rights*

As noted, defendant was arrested on March 25, 1989, a Saturday, at approximately 1:30 p.m. At approximately 4:00 p.m. on the same date,

Knebel and Salgado began to interview him in an office area of their detective bureau. The interview lasted approximately half an hour.

At the outset, Knebel informed defendant that the officers wished to question him concerning a homicide, and added that defendant had "certain rights." Knebel inquired: "Do you know your rights?" When defendant answered in the negative, Knebel responded, "you don't know your rights?" Defendant answered, "I don't need to know." Knebel then delivered the full *Miranda* advisement.

Knebel inquired whether defendant understood the rights that had been explained to him, and received an affirmative response. Knebel asked: "Do you wish to give up your right to remain silent?" Defendant answered: "Yeah." Knebel asked: "Do you wish to give up the right to speak to an attorney and have him present during questioning?" Defendant answered with a question: "You talking about now?" Knebel responded: "Do you want an attorney here while you talk to us?" Defendant answered: "Yeah." Knebel responded: "Yes you do." Defendant returned: "Uh huh." Knebel asked, "Are you sure?" Defendant answered: "Yes." Salgado stated: "You don't want to talk to us right now." Defendant answered: "Yeah, I'll talk to you right now." Knebel stated: "Without an attorney." Defendant responded: "Yeah."

Knebel then explained: "OK, let's be real clear. If you . . . if you want an attorney here while we're talking to you we'll wait till Monday and they'll send a public defender over, unless you can afford a private attorney, so he can act as your . . . your attorney." Defendant responded: "No I don't want to wait till Monday." Knebel repeated: "You don't want to wait till Monday." Defendant replied: "No." Knebel clarified: "You want to talk now." Defendant replied: "Yes." Knebel inquired: "OK, do you want to talk now because you're free to give up your right to have an attorney here now?" Defendant responded: "Yes, yes, yes."

In our view, the foregoing recitation of facts demonstrates defendant's knowing and voluntary waiver of his right to counsel. At the outset of the interrogation, defendant properly was admonished, answered in the affirmative when asked whether he understood his rights, and evinced willingness to waive his right to remain silent. When the interrogating officers asked whether defendant would waive his right to have an attorney present, defendant responded with a question—"you talking about now?" He already had agreed to waive his right to remain silent, and his question suggests to us that his willingness to waive the assistance of counsel turned on whether he could secure the presence of counsel immediately. This suggestion is reinforced by his answers to the officers' requests for clarification. Also supporting this conclusion as to defendant's state of mind is Knebel's testimony that

at the outset of the interrogation, defendant appeared confused concerning when counsel could be provided but, upon learning that counsel would not be available immediately, seemed eager to speak with the officers, acknowledging an understanding that his decision to speak constituted a waiver of his right to have an attorney present. Defendant's final and impatient "yes, yes, yes" confirms our conclusion that, once the question whether counsel could be provided immediately had been resolved, defendant had not the slightest doubt that he wished to waive his right to counsel and commence the interrogation. Under the totality of the circumstances, defendant—who had prior experience with police interrogation—knowingly and voluntarily waived his right to counsel.

Defendant claims that a contrary conclusion is required. He points out that in *Miranda, supra,* 384 U.S. 436, the high court specified that "[i]f [the suspect] *indicates in any manner* and at any stage of the process that he wishes to consult with an attorney before speaking there can be no questioning. Likewise, if the individual is alone and *indicates in any manner* that he does not wish to be interrogated, the police may not question him." (*Miranda, supra,* 384 U.S. at pp. 444–445, italics added.) According to defendant, in response to the *Miranda* admonition he plainly "indicated" his desire to consult with an attorney, and questioning should have ceased instantly. He claims that Knebel violated rights secured to him by the *Miranda* decision when the officer continued the interchange with defendant and sought to clarify defendant's intent.

■ The question whether a suspect has waived the right to counsel with sufficient clarity prior to the commencement of interrogation is a separate inquiry from the question whether, *subsequent* to a valid waiver, he or she effectively has invoked the right to counsel. (*Smith v. Illinois* (1984) 469 U.S. 91, 98 [83 L.Ed.2d 488, 105 S.Ct. 490] [analyzing a defendant's responses to an initial *Miranda* advisement]; *People v. Martinez* (2010) 47 Cal.4th 911, 951 [105 Cal.Rptr.3d 131, 224 P.3d 877].) It is settled that in the latter circumstance, after a knowing and voluntary waiver, interrogation may proceed "until and unless the suspect *clearly* requests an attorney." (*Davis v. United States* (1994) 512 U.S. 452, 461 [129 L.Ed.2d 362, 114 S.Ct. 2350], italics added.) Indeed, officers may, but are *not required* to, seek clarification of ambiguous responses before continuing substantive interrogation. (*Id.* at p. 459.)

With respect to an initial waiver, however, "[a] valid waiver need not be of predetermined *form,* but instead must reflect that the suspect in fact knowingly and voluntarily waived the rights delineated in the *Miranda* decision." (*People v. Cruz, supra,* 44 Cal.4th at p. 667, italics added; see *Berghuis v.*

*Thompkins, supra,* 560 U.S. at p. ___ [176 L.Ed.2d at p. 1113].) [*Miranda* "does not impose a formalistic waiver procedure that a suspect must follow to relinquish these rights."].)

This court has recognized that "when a suspect under interrogation makes an ambiguous statement that could be construed as an invocation of his or her *Miranda* rights, 'the interrogators may *clarify* the suspect's comprehension of, and desire to invoke or waive, the *Miranda* rights.' " (*People v. Farnam* (2002) 28 Cal.4th 107, 181 [121 Cal.Rptr.2d 106, 47 P.3d 988], italics added [analyzing the defendant's preadmonition statements in which he announced he would not answer questions]; see *People v. Johnson* (1993) 6 Cal.4th 1, 25 [23 Cal.Rptr.2d 593, 859 P.2d 673] [analyzing the defendant's statement " 'no tape recording, I don't want to incriminate myself,' " made at the outset of an interview, prior to a *Miranda* advisement]; *People v. Clark* (1993) 5 Cal.4th 950, 991 [22 Cal.Rptr.2d 689, 857 P.2d 1099] [officers properly responded to assertedly ambiguous statements during admonition, with comments calling for clarification], disapproved on another ground in *People v. Doolin, supra,* 45 Cal.4th at p. 421, fn. 22; *U.S. v. Rodriguez* (9th Cir. 2008) 518 F.3d 1072, 1080 [distinguishing pre- and postwaiver assertion of rights and, in the instance of initial waivers at the commencement of interrogation, concluding that officers should clarify ambiguous statements made by the defendant]; 2 LaFave et al., Criminal Procedure (3d ed. 2007) § 6.9(g), p. 865.)

■ Whereas the question whether a waiver is knowing and voluntary is directed at an evaluation of the defendant's state of mind, the question of ambiguity in an asserted invocation must include a consideration of the communicative aspect of the invocation—what would a *listener* understand to be the defendant's meaning. The high court has explained—in the context of a postwaiver invocation—that this is an objective inquiry, identifying as ambiguous or equivocal those responses that "a reasonable officer in light of the circumstances would have understood [to signify] only that the suspect *might* be invoking the right to counsel." (*Davis v. United States, supra,* 512 U.S. at p. 459, relying upon *Connecticut v. Barrett* (1987) 479 U.S. 523, 529 [93 L.Ed.2d 920, 107 S.Ct. 828] [a decision analyzing a response to an initial admonition]; see also *People v. Gonzalez* (2005) 34 Cal.4th 1111, 1124 [23 Cal.Rptr.3d 295, 104 P.3d 98].) This objective inquiry is consistent with our prior decisions rendered in the context of analyzing whether an assertion of rights at the initial admonition stage was ambiguous. (See *People v. Farnam, supra,* 28 Cal.4th at p. 181.) We note that a similar objective approach has been applied by the United States Court of Appeals for the Ninth Circuit to identify ambiguity in a defendant's response to a *Miranda* admonition; a response that is reasonably open to more than one interpretation is ambiguous, and officers may seek clarification. (*U.S. v. Rodriguez, supra,* 518 F.3d at p. 1080.)

In certain situations, words that would be plain if taken literally actually may be equivocal under an objective standard, in the sense that *in context* it would not be clear to the reasonable listener what the defendant intends. In those instances, the protective purpose of the *Miranda* rule is not impaired if the authorities are permitted to pose a limited number of followup questions to render more apparent the true intent of the defendant.

In the present case, defendant had indicated to the officers that he understood his rights and would relinquish his right to remain silent. When asked whether he also would relinquish the right to an attorney and to have an attorney present during questioning, defendant responded with a question concerning timing. In light of defendant's evident intent to answer questions, and the confusion observed by Knebel concerning when an attorney would be available, a reasonable listener might be uncertain whether defendant's affirmative remarks concerning counsel were intended to invoke his right to counsel. Furthermore, under the circumstances, it does not appear that the officers were "badgering" defendant into waiving his rights; his response reasonably warranted clarification. (See *Michigan v. Harvey* (1990) 494 U.S. 344, 350 [108 L.Ed.2d 293, 110 S.Ct. 1176]; see also *Montejo v. Louisiana* (2009) 556 U.S. ___, ___ [173 L.Ed.2d 955, 129 S.Ct. 2079, 2090].)

In addition, the officers' response to defendant's question concerning the timing of the appointment of counsel was appropriate, because the authorities are not required to have an attorney on call for the purpose of custodial interrogation. (*People v. Smith* (2007) 40 Cal.4th 483, 503 [54 Cal.Rptr.3d 245, 150 P.3d 1224]; see also *People v. Bradford* (1997) 14 Cal.4th 1005, 1045–1046 [60 Cal.Rptr.2d 225, 929 P.2d 544].) Significantly, the interchange occurred on a Saturday afternoon, and the officers permissibly informed defendant that the interview would be postponed until the following Monday if he chose to have appointed counsel present. After the police officers appropriately clarified when counsel would be available and that questioning would be postponed until that time if defendant requested counsel, defendant made it very plain that he understood his rights and wished to proceed with the interrogation in the absence of counsel. In sum, the two or three questions posed by the officers at the outset of the interrogation merely clarified defendant's position regarding the circumstances under which he would invoke his right to counsel.

█ Defendant relies upon *Desire v. Attorney General of California* (9th Cir. 1992) 969 F.2d 802, 804–805, for the proposition that when a defendant has invoked his or her *Miranda* rights, law enforcement officers may not inquire whether the suspect will answer questions without the presence of a lawyer. This argument depends upon the assumption that defendant effectively invoked his right to counsel in response to the *Miranda*

admonition, an assumption we have rejected. In any event, that case, which concerned a postwaiver invocation of rights, is distinguishable. In *Desire,* it was *undisputed* that the accused responded to the *Miranda* advisement with a clear invocation of his rights to counsel and to remain silent. (969 F.2d at p. 804.) Thereafter, the attorney assigned to the defendant telephoned the police station and requested to speak with him. The interrogating officers acknowledged to the attorney that the defendant had invoked his rights under *Miranda,* but they did not permit counsel to speak with the defendant, claiming that no further interrogation would occur in counsel's absence. The defendant was not permitted to telephone the attorney. Despite the plain invocation of rights and contrary to the indication given to the attorney by the officers that they would not question the suspect in the attorney's absence, they initiated a custodial interrogation at which the defendant waived his right to counsel and to remain silent. The reviewing court held the resulting statements to be inadmissible, because they were obtained in clear violation of *Edwards v. Arizona* (1981) 451 U.S. 477 [68 L.Ed.2d 378, 101 S.Ct. 1880], a decision establishing that when a suspect declines to waive his or her rights and instead invokes the right to counsel, interrogation may not *resume* without counsel present, absent contact initiated by the accused. (*Desire v. Attorney General of California, supra,* 969 F.2d at pp. 804–805.) As we have demonstrated above, however, in the present case defendant did *not* unambiguously invoke his right to counsel during the initial *Miranda* advisement, and the officers simply clarified his intent.

Defendant also relies upon *Alvarez v. Gomez* (9th Cir. 1999) 185 F.3d 995 for the proposition that an accused's thrice-repeated question during *Miranda* advisement concerning whether an attorney could be provided immediately constituted an unequivocal invocation of the right to counsel. That case is distinguishable. In *Alvarez,* the suspect began requesting an attorney as soon as he was asked whether he wished to waive his right to remain silent and submit to questioning, inquiring: " 'Can I get an attorney right now, man?' " When the officer responded: " 'Pardon me?' " the suspect repeated: " 'You can have [an] attorney right now?' " The officer responded that the suspect could have an attorney appointed, and the suspect repeated: " 'Well, like right now you got one?' " The interrogating officer informed the suspect that counsel would not be available until the time of the arraignment. (*Id.* at pp. 996–997, italics omitted.) In addition to denominating the questions, in *context,* as a clear invocation of the right to counsel, the court explained that it was evident the police were not merely seeking clarification but sought to undermine the defendant's intent to assert his rights. The court apparently reached this conclusion because, in fact, there were attorneys available 24 hours a day to a suspect who invoked the right to counsel prior to interrogation. (*Id.* at p. 998 & fn. 3.) In the present case, by contrast, in context

defendant's statements suggested some ambiguity—sufficient ambiguity that a reasonable officer would be uncertain of defendant's actual intent.

In his supplemental reply brief, defendant relies upon this court's decision in *People v. Neal* (2003) 31 Cal.4th 63 [1 Cal.Rptr.3d 650, 72 P.3d 280]. In that case, the defendant plainly invoked his right to counsel on nine occasions, but the interrogating officers purposefully ignored the invocations and continued their intensive interrogation concerning the crime. When the defendant resisted incriminating himself, they placed him in a cell overnight without food, drink, or toilet facilities, leading to his making a statement on the following day that we concluded should not have been admitted in evidence. That case is distinguishable because it was undisputed that the defendant clearly invoked his rights to remain silent and to counsel on numerous occasions at the outset of the first interview, but the officers nonetheless conducted a vigorous substantive interrogation in a coercive setting. There was no claim in the *Neal* case that the officers responded by seeking clarification; it was undisputed that they intentionally disregarded the requirements of *Miranda* and continued the substantive interrogation of the youthful, inexperienced defendant pursuant to a departmental policy designed to disregard invocations of *Miranda* rights. (*Neal*, at p. 68.)

### ii. *Asserted subsequent invocation—right to counsel*

Defendant asserts that he invoked his right to counsel at a subsequent point during the first interrogation, when he stated: "I want to see my attorney cause you're all bullshitting now."

This statement was made under the following circumstances. Knebel and Salgado questioned defendant concerning his whereabouts and activities on the night of the murder. They insisted, over defendant's denials, that Loretta Kelley and Margaret Williams would testify he was involved in robbing and murdering the victim.

Knebel then stated: "[Kelley] was with you when you torched the car. Was Margaret [Williams] with you too?" Defendant answered: "[Kelley] wasn't with me when I torched no car." Knebel asked: "Was Margaret [Williams] driving you over there to torch the car?" Defendant answered: "No. Who told you that?" Knebel returned: "Why did you have to kill the woman, she gave you the money. She gave you the money from the little traffic collision w[h]ere she ran into . . . the back of you."

Defendant responded: "Wait, wait, wait, wait. You sayin' that I killed somebody. I'm tellin' you that I haven't, ok." Knebel responded: "Yeah, but you're lying." Salgado added: "I'm going to tell you something, ok. Right

now you are in a whole heap of trouble." Defendant replied: "I see this. This is hearsay . . . but see I done told . . . ." Salgado interrupted: "No, no they, nah, nah, nah, nah, wait, wait a minute David. This isn't hearsay. This is not the courtroom right here. There's no one . . . hearsay, there's no . . . no rumor. There's nothing. We have evidence." Defendant responded "You got to show . . . you got to do more than this." Salgado responded: "You're right . . . ." Defendant interrupted: "*I want to see my attorney cause you're all bullshitting now.*" (Italics added.) Salgado continued: "I know. You know we have to show more than this. You're right." Knebel interrupted: "You want your attorney now?"

Salgado continued: "But what we wanted . . . an opportunity now to see if you wanted to tell the truth or not and obviously you're not ready to tell the truth." Defendant responded: "Tell the truth about what?" Salgado began: "Well . . . your . . ." and defendant repeated: "I haven't killed nobody." Salgado replied: "I'm not saying you killed anybody. You put her in the trunk." Defendant responded: "I didn't put nobody in the trunk." Knebel interrupted: "*Wait a minute. Do you want your attorney now or do you want to talk to us?*" Defendant replied: "*I'll talk to him.* But you sittin' up here telling me that I done killed somebody." Knebel responded: "You did." Defendant replied: "No I didn't." Knebel asked: "*Do you want to talk to him without the attorney?*" Defendant responded: "*Oh yeah I talk to him.*" (Italics added.) Knebel stated: "Alright I'll shut up."

▮ Once the defendant has waived his or her right to counsel, as we have determined defendant did at the outset of the first interview, if the defendant has a change of heart, he or she must invoke the right to counsel *unambiguously* before the authorities are required to cease the questioning. (*People v. Rundle, supra*, 43 Cal.4th at p. 114.) The suspect must articulate sufficiently clearly his or her desire to have counsel present so that a reasonable officer in the circumstances would understand the statement to be a request for an attorney. (*Davis v. United States, supra*, 512 U.S. at p. 459.) "[I]f a suspect makes a reference to an attorney that is ambiguous or equivocal in that a reasonable officer *in light of the circumstances* would have understood only that the suspect *might* be invoking the right to counsel, our precedents do not require the cessation of questioning." (*Ibid.*, italics added.)

Considering the totality of the circumstances, we find that defendant's statement in the present case constituted an expression of frustration and, as the trial court suggested, game playing, and was not an unambiguous invocation of the right to counsel precluding even the asking of clarifying questions. We reached the same conclusion under comparable circumstances in *People v. Davis* (2009) 46 Cal.4th 539 [94 Cal.Rptr.3d 322, 208 P.3d 78]. In that case, the defendant initially agreed to speak with investigating officers

and answered questions for approximately one hour. When the officers began directly accusing him of having abducted the victim, however, he stood up and stated: " 'Well then book me and let's get a lawyer and let's go for it, man, you know.' " We concluded that substantial evidence supported the trial court's view that the comment was not an unequivocal invocation but merely a " 'challenge,' " and that "defendant was using 'as much technique as the people who were questioning him.' " (*Id.* at p. 587; see also *People v. Musselwhite* (1998) 17 Cal.4th 1216, 1238, 1240 [74 Cal.Rptr.2d 212, 954 P.2d 475] [comparable comments may evidence " 'only momentary frustration and animosity' "].) Moreover, prior to the resumption of questioning, Knebel *clarified* defendant's actual intent—clarification that the high court has denominated good practice (although not required) in similar circumstances. (*Davis v. United States, supra,* 512 U.S. at pp. 461–462.)

### iii. *Asserted subsequent invocation—right to remain silent*

Defendant also contends that toward the conclusion of the first interview, the officers failed to honor his invocation of the right to remain silent. Salgado displayed a photograph of the victim to defendant, saying "this is the woman I'm talking about. How did you meet her?" Defendant answered: "I don't know that woman." Salgado countered, "I'm not saying that you know her. I know you don't know her." Defendant confirmed: "I don't know her." Salgado replied: "I know you don't know her. She was just someone you met that day." Defendant repeated: "I don't know her." Salgado responded: "I know you don't know her. I know that. You didn't know her. You didn't know her. I know that. How did you meet her that day?" Defendant responded: "I don't know." Salgado persisted: "What did you do . . . that day with her? Why did . . . it turn [out] the way it did?" Defendant responded: "*I don't want to talk about it.*" (Italics added.) Salgado said: "Tell me. David . . ." and defendant interjected: "I did not know her." Salgado said again, "David why did it turn [out] that way?" Defendant again said: "I did not know her." Salgado replied: "You don't know her, but why did it get that way? Why did she have . . ." and defendant interjected: "I don't [*sic*] what you talk about. I didn't put nobody in no trunk." He explained that he had nothing to do with the crimes. He continued to respond to questions and to deny all knowledge of or involvement in the crimes.

■ "A defendant has not invoked his or her right to silence when the defendant's statements were merely expressions of passing frustration or animosity toward the officers, or amounted only to a refusal to discuss a particular subject covered by the questioning." (*People v. Rundle, supra,* 43 Cal.4th at p. 115; see also *People v. Martinez, supra,* 47 Cal.4th at pp. 947–948; *People v. Stitely* (2005) 35 Cal.4th 514, 533–536 [26 Cal.Rptr.3d

1, 108 P.3d 182].) In our view, the statement italicized above—"I don't want to talk about it"—was an expression of defendant's frustration with Salgado's failure to accept defendant's repeated insistence that he was not acquainted with the victim as proof that he had not encountered her on the night of the crime, rather than an unambiguous invocation of the right to remain silent. (See *Berghuis v. Thompkins, supra*, 560 U.S. at p. ___ [179 L.Ed.2d at p. 1110] [the requirement that a midinterrogation invocation be clear and unambiguous extends to the assertion of the right to remain silent]; *People v. Martinez, supra*, 47 Cal.4th at pp. 947–948.) A reasonable officer could interpret defendant's statement as comprising part of his denial of any knowledge concerning the crime or the victim, rather than an effort to terminate the interrogation. (See *People v. Silva* (1988) 45 Cal.3d 604, 629–630 [247 Cal.Rptr. 573, 754 P.2d 1070].)

### iv. *Absence of readvisement*

Next, defendant contends his statements during the second interrogation were obtained in violation of *Miranda* because Knebel questioned him without preceding the interview with a second *Miranda* advisement.

The interview occurred on March 27, 1989, at 9:00 a.m. Knebel questioned defendant in the same area of the detective bureau where the first interrogation occurred. Knebel did not repeat the *Miranda* advisement, but informed defendant that he wished to ask questions concerning a collision defendant may have had with Mrs. Lacey's vehicle. Defendant responded that he was willing to answer questions. He offered an alibi and claimed he had purchased his automobile in a damaged condition. He denied having had an accident in the prior week, and claimed he had replaced the taillight lens about one month earlier. He claimed the vehicle was parked at his home on the night of the crime, adding that at that time the vehicle had no brakes and was not in a drivable condition.

■ We are not persuaded by defendant's claim. After a valid *Miranda* waiver, readvisement prior to continued custodial interrogation is unnecessary "so long as a proper warning has been given, and 'the subsequent interrogation is "reasonably contemporaneous" with the prior knowing and intelligent waiver.' [Citations.]" (*People v. Smith, supra*, 40 Cal.4th at p. 504.) The necessity for readvisement depends upon various circumstances, including the amount of time that has elapsed since the first waiver, changes in the identity of the interrogating officer and the location of the interrogation, any reminder of the prior advisement, the defendant's experience with the criminal justice system, and "[other] indicia that the defendant subjectively underst[ood] and waive[d] his rights." (*Ibid.*; see *People v. Mickle* (1991) 54 Cal.3d 140, 171 [284 Cal.Rptr. 511, 814 P.2d 290] [an interrogation conducted 36 hours after

the first interview was reasonably contemporaneous].) In the present case, the officers were not required to readvise defendant, because the second interrogation was reasonably contemporaneous with the first, having occurred approximately 40 hours later in the same location as the first, and was conducted by one of the previous interrogators. In addition, as the trial court was aware at the hearing, defendant had experience with the criminal justice system and evinced no reluctance to be interviewed. It is readily apparent the trial court did not credit defendant's testimony claiming that, prior to the second interview or, indeed, at any time, Salgado had promised him a prison term of 18 years in return for a statement implicating another person. Under these circumstances, the court properly ruled the officers were not required to remind defendant of his rights.

### c. *Voluntariness claim*

Defendant contends the trial court erred in admitting all of his statements to the authorities, because these statements resulted from what he characterizes as a "four-day effort by the police to break his will." He claims the admission of the assertedly involuntary statements constituted a violation of his rights under the Fifth and Fourteenth Amendments to the United States Constitution.

Some elements of defendant's claim were not raised below and may be forfeited. At the hearing on the admissibility of the statements, the defense did not allege that defendant was subject to coercion during the first interrogation, nor was it claimed that subsequent statements were rendered involuntary by virtue of coercion at the first interrogation or by virtue of lengthy incarceration prior to arraignment. A defendant ordinarily forfeits elements of a voluntariness claim that were not raised below. (*People v. Rundle, supra,* 43 Cal.4th at p. 121 [defendant forfeited the claim that the length of interrogation and of an interview with state-appointed psychiatrist rendered statements involuntary, because he failed to raise these claims in the trial court]; *People v. Ray* (1996) 13 Cal.4th 313, 339 [52 Cal.Rptr.2d 296, 914 P.2d 846] [claim of delay in delivering *Miranda* admonition did not preserve a claim that an offer of benefit rendered a statement involuntary].)

On the other hand, in his testimony at the hearing, defendant did claim his invocation of the rights to counsel and to remain silent had been ignored *throughout* his contacts with the officers. And the prosecutor elicited testimony from Detective Knebel concerning defendant's demeanor during the first interrogation and his reaction to the mention of the death penalty.

As described in connection with defendant's *Miranda* claim, the trial court concluded the People had sustained their burden of demonstrating the voluntariness of all four statements. The trial court's conclusions went beyond the

defense argument, responding to the prosecution's effort to carry its burden of establishing the voluntariness of the confessions by (among other means) refuting the possibility that purported threats concerning the death penalty, or admonitions that defendant would be "better off if he told the truth," served to coerce the confession given by defendant. Having listened to the taped statements and seen and heard the witnesses, the trial court concluded that defendant had not been subjected to physical or psychological coercion. The court rejected defendant's claim that he made his incriminating statements in response to a promise that his maximum sentence would be 18 years in prison. Assuming, without deciding, that all of defendant's claims have been preserved, for the reasons discussed below we conclude that the trial court did not err in concluding that all four statements were voluntary.

■ The basic law is settled. A criminal conviction may not be founded upon an involuntary confession. (*Lego v. Twomey* (1972) 404 U.S. 477, 483 [30 L.Ed.2d 618, 92 S.Ct. 619].) "The prosecution has the burden of establishing by a preponderance of the evidence that a defendant's confession was voluntarily made. [Citations.] In determining whether a confession was voluntary, ' "[t]he question is whether defendant's choice to confess was not 'essentially free' because his [or her] will was overborne." ' [Citation.] Whether the confession was voluntary depends upon the totality of the circumstances. [Citations.] ' "On appeal, the trial court's findings as to the circumstances surrounding the confession are upheld if supported by substantial evidence, but the trial court's finding as to the voluntariness of the confession is subject to independent review." ' [Citation.]" (*People v. Carrington* (2009) 47 Cal.4th 145, 169 [97 Cal.Rptr.3d 117, 211 P.3d 617].)

In evaluating the voluntariness of a statement, no single factor is dispositive. (*People v. Williams* (1997) 16 Cal.4th 635, 661 [66 Cal.Rptr.2d 573, 941 P.2d 752] [rejecting the view that an offer of leniency necessarily renders a statement involuntary].) The question is whether the statement is the product of an " 'essentially free and unconstrained choice' " or whether the defendant's " 'will has been overborne and his capacity for self-determination critically impaired' " by coercion. (*Schneckloth v. Bustamonte* (1973) 412 U.S. 218, 225 [36 L.Ed.2d 854, 93 S.Ct. 2041].) Relevant considerations are " 'the crucial element of police coercion [citation]; the length of the interrogation [citation]; its location [citation]; its continuity' as well as 'the defendant's maturity [citation]; education [citation]; physical condition [citation]; and mental health.' " (*People v. Williams, supra,* 16 Cal.4th at p. 660.)

"In assessing allegedly coercive police tactics, '[t]he courts have prohibited only those psychological ploys which, under all the circumstances, are so coercive that they tend to produce a statement that is both involuntary and unreliable.' [Citation.]" (*People v. Smith, supra,* 40 Cal.4th at p. 501.)

A confession is not involuntary unless the coercive police conduct and the defendant's statement are causally related. (*Colorado v. Connelly* (1986) 479 U.S. 157, 164, fn. 2, 167 [93 L.Ed.2d 473, 107 S.Ct. 515]; *People v. Guerra* (2006) 37 Cal.4th 1067, 1093 [40 Cal.Rptr.3d 118, 129 P.3d 321]; *People v. Maury* (2003) 30 Cal.4th 342, 404–405 [133 Cal.Rptr.2d 561, 68 P.3d 1]; *People v. Benson* (1990) 52 Cal.3d 754, 778 [276 Cal.Rptr. 827, 802 P.2d 330]; see also *People v. Carrington, supra,* 47 Cal.4th at pp. 170–171; *U.S. v. Dehghani* (8th Cir. 2008) 550 F.3d 716, 719–720; *U.S. v. Charles* (7th Cir. 2007) 476 F.3d 492, 497; *Hill v. Anderson* (6th Cir. 2002) 300 F.3d 679, 682; *Pollard v. Galaza* (9th Cir. 2002) 290 F.3d 1030, 1034; O'Neill, Cal. Confessions Law (2009) § 1.6, p. 8.)

### i. *Factual background*

### a. *First interview*

Defendant points to a number of elements of the first interrogation in support of his claim of coercion, as set forth below in italics. In the course of the first interview, Detective Knebel informed defendant that Margaret Williams had told two other persons that defendant gave a person some money to act as a lookout and obtain gasoline, and that defendant set fire to a vehicle "where there was a lady inside that you robbed and murdered." Knebel commented, "you're going to go to prison" or "*fry in the gas chamber.*" After defendant agreed to speak with Detective Salgado despite defendant's statement that "I want to see my attorney cause you're all bullshitting now," and after defendant offered various exculpatory remarks about his activities, Salgado explained that the officers had additional evidence but wished to hear defendant's account. Salgado expressed confidence that defendant had been involved in the murder but suggested he lacked the intent to kill: "[Y]ou see this woman died from choking from the smoke. So when you say I didn't kill the woman *I believe you didn't mean to kill her.* The smoke killed her, but I know that you're involved." Salgado added that the only reason defendant did not wish to "tell us . . . what's inside you" is that defendant did not wish to return to prison. Salgado, claiming it would be helpful to defendant if he were to tell the truth, stated that "*the only thing that's going to help you, ok is to tell the truth.*" He added that Knebel, as the lead investigator, and Salgado himself, would take their evidence to court and defendant would be found guilty. After a guilty verdict, he added: The only thing "*that's going to save you . . . from,* you know, spending the rest of your *life in prison . . . or the gas chamber* is for you, right now, to tell us the truth about this and why you did it cause we don't have to prove that you did it . . . we can prove it already. Why *you . . . didn't mean for her to go through this.* It would, it would . . . *you didn't mean for her to die* and when the jury and the judge looks at this, that you *admitted you were wrong and you told the*

*truth they're not gonna be so hard on you.* And that's my experience[,] David[,] and I've been in this job a long time." (Italics added.) When Salgado mentioned life in prison, Knebel interjected another reference to the alternative, the death penalty.

When defendant denied killing anyone, Salgado repeated that he knew defendant did not intend to kill the victim. Salgado persistently asked whether and how defendant knew the victim. Salgado asked: "[W]hy did it get that way? Why did . . . she have (inaudible)." Defendant claimed he did not know what Salgado was talking about. Defendant explained that he had nothing to do with the crime, that Kelley's and Margaret Williams's statements were insignificant, adding sarcastically: "I done told [Kelley] I done killed many people. I done told . . . that girl right there she scared to death of me when I got out."

Salgado responded with another reference to "certain *evidence that you don't even know about* that puts you there." Defendant replied that the police had no evidence against him, repeating: "You don't. Cause I wasn't there." Salgado asked: *"You don't know what gasoline does to you?"* (Italics added.) When defendant replied that he did not know what gasoline "does to you," Salgado responded: "I know you don't or else you wouldn't be sitting here lying like you are." Knebel then suggested there might be fingerprint evidence, a suggestion that respondent concedes was not based in fact.

Salgado stated: "This is your chance now, right here before it gets any . . . farther outside of this room . . . in front of any district attorney[.] In front of any judge or jury. Cause you know how the system works." Defendant acknowledged: "I know how the system works," adding: "If I got found guilty on the murder I'm goin' anyway." Knebel interjected: "You're gone." Salgado said, *"That's not true."* He added: *"I'll tell you why . . . . It's because when the jury and judge looks at these things they look for the truth."* Knebel added: *"They look for remorsefulness on the part of the guy that did the crime."* Knebel added: "[I]f from jump street you deny it and we go through and prove it the jury's gonna say, *you ain't worth saving . . . ."* Defendant stated: *"Kill me."* Knebel added: *"give him the gas chamber."* Salgado asked: "Is that what you want?" Defendant replied: "[They're] *gonna have to kill me."* Knebel responded: *"They will."* (Italics added.) Salgado asked whether defendant wanted to die, and when defendant responded he did not, Salgado said: "Then tell me the truth." Defendant denied killing the victim.

Knebel then informed defendant that when he took the victim to the ATM, "three people came up right after you guys finished . . . and *they saw you face to face."* (Respondent concedes this claim was not based in fact.) Salgado commented: "Well David that's what's going to *send you to the gas chamber."* (Italics added.) Defendant replied: "I don't know what you're talking

about." Knebel asserted: "They are going to identify you." Defendant repeated: "I don't know what you're talking about." Knebel responded: "Well I'm tired of wasting my time." Defendant commented: "If they can identify me now they gonna have to." Salgado announced defendant would be returned to his cell, commenting: "But I want you to think about what I'm telling you . . . about remorsefulness and the truth." He added: "[I]f you change your mind and you want to talk about her with me all you have to do is tell the jailer." Defendant responded: "I just talked to you. I don't . . . I didn't kill her."

As noted, Knebel testified at the hearing held to determine the admissibility of the statements that, during the first interview, defendant was cocky and appeared to want to speak to the officers. Knebel added that defendant did not react emotionally to the officers' references to the death penalty.

### b. *Second interview*

The second interview also occurred at the detective bureau offices, on March 27, 1989, beginning at 9:00 a.m. Knebel informed defendant he wished to question him concerning his automobile, and defendant agreed to speak. The tape-recorded interview lasted approximately five minutes. Knebel and defendant were the only persons present. Without readvising defendant of his rights, Knebel asked him how long he had owned his Vega, how collision damage to the front of the vehicle had occurred, and when defendant had replaced a taillight lens. Knebel testified at the hearing conducted on the admissibility of defendant's statements that he had not threatened defendant to persuade him to be interviewed, nor had he offered any promises. Knebel testified that defendant's demeanor was "[v]ery calm and matter of fact."

By contrast, at the hearing held on the admissibility of the statements, defendant testified that approximately 15 minutes prior to the second interview, Salgado promised him an 18-year prison term in return for a statement implicating other persons. According to defendant's testimony, Salgado "was telling me that he knew I wasn't the only one there, that they had a witness that said it was a man and a woman arguing or something and that I didn't do this by myself, it had to be somebody there, give him somebody and he would promise me 18 years." Defendant added that at the time of the interview, he was "pretty stressed out because they had dragged me around the city, no shoes on my feet, just an orange jumpsuit. They had stripped me buck naked, took all my clothes, my jewelry and everything, threw me [in] a room and didn't tell me nothing." He claimed to have repeatedly invoked his right to counsel and to be silent.

### c. *Third interview*

On March 28, 1989, at approximately 8:30 a.m., Detective Knebel examined defendant, noticing pink marks on defendant's hand and ankle that Knebel believed were burn marks. Knebel transported defendant to Huntington Memorial Hospital for examination by a physician. Knebel returned with defendant to the detective bureau and photographed the marks. As Knebel prepared to return defendant to the jail, defendant asked him whether the two could speak. At approximately 10:00 a.m., after Knebel reminded him of his rights, defendant waived his rights to remain silent and to counsel. Two other officers were present. There was no tape recording, and the officers did not take notes. Defendant claimed that on the night of the crime, he had been picked up by Kelley and had driven around with her. When he learned her vehicle was stolen, he feared they would be apprehended and he would incur a revocation of his parole. He concluded they should burn the vehicle to destroy his fingerprints. Defendant was burned in the process of igniting the fire.

At the conclusion of the interview, defendant agreed to provide a tape-recorded statement, and Knebel returned him to the jail to await Salgado's participation.

### d. *Fourth interview*

The fourth interview began at 1:15 p.m. the same day. After Detective Knebel readvised defendant of his rights, he waived them. Defendant asked that the tape recorder be turned off. Knebel's contemporary written report indicated that defendant said to Salgado, " '*You said you could help me, how can you help me*?' " (Italics added.) According to the report, Salgado responded that "the only way he could help him is if he told the truth and that it would look better in court if he told the whole truth rather than tell some of the truth and some lies." Under questioning, defendant repeated the story that Loretta Kelley had picked him up in the blue Volvo and that the two burned the car when defendant learned it was stolen, that they sprinkled the vehicle with gasoline, that he lit the fluid, that Kelley gave him some money and jewelry, and that the two proceeded to Margaret Williams's residence. The account was elicited without any reluctance or resistance on the part of defendant. Knebel turned off the tape recorder at 1:28 p.m.

While the tape recorder was off, defendant informed the officers that he wanted to add something to his statement, namely, that he first realized there was a woman in the trunk of the vehicle when he read about it in the newspaper. The tape recorder was turned back on at 1:30 p.m. Defendant then explained the circumstances under which Margaret Williams showed him the

relevant newspaper article. There was further questioning concerning the items of property left in the victim's vehicle. Salgado asked where defendant and Kelley obtained the container for the gasoline, and defendant replied they had used an antifreeze container from the backseat of the car. Defendant then paid "somebody" to procure the gasoline. The tape recorder was turned off again at 1:33 p.m.

At the hearing held on the admissibility of the statements, Knebel testified that, as the officers prepared to return defendant to his cell, Salgado posed a further question. According to Knebel's notes, Salgado asked defendant "if he was there when the fire started, what about the gun that was there. [Defendant] then said that the gun was his and that he had had it since he got out of prison. [Defendant] then said that he had robbed her and asked to go back on the tape for the remainder of [the] interview."

The tape-recorded interview continued at 1:39 p.m. Defendant explained how he set the car on fire. He said the .22-caliber firearm was his, and stated he had the gun with him "cause me and Loretta [Kelley] robbed her" at a location near his residence. He claimed Kelley unexpectedly accosted the victim and robbed her. According to him "it was too late then." Accordingly, he and Kelley entered her vehicle and drove the victim to the ATM to withdraw cash, after which the victim telephoned a friend to obtain more money. Defendant claimed Kelley placed the victim in the trunk over vocal protests. Then Kelley shot the victim through the back seat "talking about you can kill her like this." Then they acquired the gasoline. Both he and Kelley sprinkled the vehicle with gasoline. He claimed Kelley lit the fluid and he caught on fire when he reached into the front seat to retrieve his firearm. They ran to Margaret Williams's residence because it was close. He did not hear any screaming. Salgado inquired, "Are you telling me the truth now," and defendant answered: "Swear to God I'm telling you the whole truth." Salgado asked whether anyone had made threats or promises to defendant, who answered in the negative. Salgado continued: "Are we . . . forcing you to tell this to us?," and defendant answered in the negative. Knebel asked why defendant was giving them his account, and defendant answered, "cause it's bothering my brain." When Knebel commented, "It's good to get it off your chest isn't it?" defendant answered, "it hurts." Salgado asked: "Do you feel better now? A little bit?" And defendant answered, "yeah."

ii. *Claimed coercion at the first interrogation*

Defendant renews his claim that the interrogating officers failed to honor his invocation of the rights to counsel and to remain silent at the first interrogation, adding that they discouraged his exercise of these rights. We have determined, however, that defendant voluntarily waived his rights. We

add that far from discouraging defendant's exercise of the right to counsel, the officers asked clarifying questions designed to afford defendant the opportunity to assert that right. We also perceive no indication that the officers discouraged defendant from exercising his right to remain silent toward the end of the first interview.

Reviewing the totality of the circumstances of the first interview, we conclude that defendant's will was not overborne. He had experience in the criminal justice system. Defendant understood his right to counsel and to remain silent, but waived those rights. He effectively parried the officers' accusations and questions, as noted by the trial court. He did not appear upset by the officers' reference to the death penalty. The overall import of the interrogation was appropriate in that the officers presented defendant with incriminating evidence, emphasized the seriousness of the charges, and urged him not to lie, because lies would antagonize the court and the jury. The interview was relatively brief. Significantly, defendant did not incriminate himself in response to the interrogation, indicating the effective functioning of his will remained intact.

Defendant insists, however, that Salgado and Knebel coerced his statements during the first interview by engaging in practices assertedly disapproved by the United States Supreme Court in *Miranda, supra,* 384 U.S. 436. He refers to the high court's discussion of potentially coercive conduct such as threatening a defendant, using deception, displaying confidence in the suspect's guilt and directing questions solely at "confirming . . . details" (*id.* at p. 450) minimizing the accused's responsibility for the crime, and employing a "good cop, bad cop" interrogation tactic. (See *id.* at pp. 449–453.) The *Miranda* decision, however, suggested that the advisements required by the opinion in that case would serve as a counterweight to the coercive pressure that may be exerted by the noted interrogation tactics. (See *id.* at pp. 464–472; see also *Rhode Island v. Innis* (1980) 446 U.S. 291, 299–300 [64 L.Ed.2d 297, 100 S.Ct. 1682].) As we have explained, defendant was advised of and waived the rights set out in *Miranda.*

Defendant nonetheless urges that the officers coerced his statements when, during the first interview, they threatened he would suffer the death penalty unless he cooperated with them. "Of course, '[a] [c]onfession induced by the threats of prosecution for a capital crime [has] been held inadmissible.' " (*People v. Avena* (1996) 13 Cal.4th 394, 420 [53 Cal.Rptr.2d 301, 916 P.2d 1000].) As defendant claims, and as demonstrated by the italicized language, *ante,* at pages 437–438, there were several references to the death penalty during the first interrogation.

Defendant also faults his interrogators for employing deceptive interrogation practices, pointing to their comments during the first interrogation that

witnesses had observed defendant at the ATM where the victim withdrew money and that fingerprint evidence tied him to the crime, and to their questions assertedly suggesting they had special evidence connected with certain properties of gasoline. Defendant cites a dissenting justice of the high court: "The compulsion proscribed by *Miranda* includes deception by the police. [Citation to *Miranda*] (indicting police tactics . . . such as using fictitious witnesses or false accusations)." (*Illinois v. Perkins* (1990) 496 U.S. 292, 306 [110 L.Ed.2d 243, 110 S.Ct. 2394] (dis. opn. of Marshall, J.); see *People v. Thompson* (1990) 50 Cal.3d 134, 167 [266 Cal.Rptr. 309, 785 P.2d 857] [deception " 'is a factor which weighs against a finding of voluntariness' "].)

■ Reference to the death penalty does not necessarily render a statement involuntary. "[A] confession will not be invalidated simply because the possibility of a death sentence was discussed beforehand. [Citations.] We have found a constitutional violation in this context only where officers threaten a vulnerable or frightened suspect with the death penalty, promise leniency in exchange for the suspect's cooperation, and extract incriminating information as a direct result of such express or implied threats and promises." (*People v. Ray, supra,* 13 Cal.4th at p. 340; see also *People v. Holloway* (2004) 33 Cal.4th 96, 116 [14 Cal.Rptr.3d 212, 91 P.3d 164].)

■ Similarly, the use of deceptive comments does not necessarily render a statement involuntary. Deception does not undermine the voluntariness of a defendant's statements to the authorities unless the deception is " ' "of a type reasonably likely to procure an untrue statement." ' " (*People v. Jones* (1998) 17 Cal.4th 279, 299 [70 Cal.Rptr.2d 793, 949 P.2d 890]; see also *People v. Smith, supra,* 40 Cal.4th at pp. 505–506.) " 'The courts have prohibited only those psychological ploys which, under all the circumstances, are so coercive that they tend to produce a statement that is both involuntary and unreliable.' " (*People v. Jones, supra,* 17 Cal.4th at pp. 297–298.)

In the present case, it is evident that neither the mention of the death penalty nor the deception overcame defendant's will. He exhibited no sign of distress in response to references to the death penalty, and remained able to parry the officers' questions. (See *People v. Jones, supra,* 17 Cal.4th at p. 298 [finding "no indication that defendant was frightened into making a statement that was both involuntary and unreliable" by the detective's "persistent references to the dire consequences he was facing"].) Defendant had experience with the criminal justice system, having been convicted of rape and burglary and having served a prison term in consequence. The deception practiced by the officers was not of a sort likely to produce unreliable self-incrimination.

Significantly, moreover, defendant did not incriminate himself as a result of the officers' remarks. (See *People v. Johns* (1983) 145 Cal.App.3d 281, 293 [193 Cal.Rptr. 182] [although the defendant lied in response to a threat made at his first interrogation, "[t]his is not the behavior of one whose free will has been overborne"].) Rather, defendant continued to deny responsibility in the face of the officers' assertions. (See *People v. Carrington, supra,* 47 Cal.4th at p. 172; *People v. Smith, supra,* 40 Cal.4th at p. 506; *People v. Guerra, supra,* 37 Cal.4th at p. 1096 ["The sole cause appearing in the record for defendant's cooperation during the interview was his desire to exculpate himself."]; *People v. Coffman and Marlow* (2004) 34 Cal.4th 1, 58 [17 Cal.Rptr.3d 710, 96 P.3d 30] ["His resistance, far from reflecting a will overborne by official coercion, suggests instead a still operative ability to calculate his self-interest in choosing whether to disclose or withhold information."]; see also *People v. Jablonski* (2006) 37 Cal.4th 774, 815–816 [38 Cal.Rptr.3d 98, 126 P.3d 938].)

■ We also observe that the suggestions made by the interrogating officers that defendant may not have been the actual killer, or may not have intended that the victim die, were not coercive. "[T]hey merely suggested possible explanations of the events and offered defendant an opportunity to provide the details of the crime. This tactic is permissible." (*People v. Carrington, supra,* 47 Cal.4th at p. 171.) And there is nothing improper in pointing out that a jury probably will be more favorably impressed by a confession and a show of remorse than by demonstrably false denials. "No constitutional principle forbids the suggestion by authorities that it is worse for a defendant to lie in light of overwhelming incriminating evidence." (*Id.* at p. 174.) Absent improper threats or promises, law enforcement officers are permitted to urge that it would be better to tell the truth. (*Ibid.; People v. Hill* (1967) 66 Cal.2d 536, 549 [58 Cal.Rptr. 340, 426 P.2d 908] ["When the benefit pointed out by the police to a suspect is merely that which flows naturally from a truthful and honest course of conduct, we can perceive nothing improper . . . ."]; O'Neill, Cal. Confessions Law, *supra,* § 1.24, p. 3; see also *Amaya-Ruiz v. Stewart* (9th Cir. 1997) 121 F.3d 486, 494 [finding no coercion in statements that " 'the . . . [c]ourt system will not forgive your lies,' " and an exhortation to the suspect to tell the truth if he wants to receive " 'forgiveness' "].)

■ We are not persuaded that the officers' vigorous interrogation, display of confidence in defendant's guilt, or use of more sympathetic and less sympathetic interrogators rendered involuntary any statement made by defendant. " 'Once a suspect has been properly advised of his rights, he may be questioned freely so long as the questioner does not threaten harm or falsely promise benefits. Questioning may include exchanges of information, summaries of evidence, outline of theories of events, confrontation with contradictory facts, even debate between police and suspect. . . .' [Citation.]" (*People v. Holloway, supra,* 33 Cal.4th at p. 115.) Finally, as stated, it is

evident that defendant's will was not overborne by any of the circumstances discussed above in connection with the first interrogation, because he continued to deny any involvement in the crime.

Moreover, contrary to defendant's claim, we do not perceive any delayed effect from the tactics challenged by defendant. Rather, he continued to deny responsibility in the second interview, which occurred two days after he made his first statement. It was not until it became apparent that incriminating evidence existed with respect to his vehicle and, significantly, that Detective Knebel seemed to believe there were burn marks on defendant's hand and ankle, that defendant initiated contact with the officers and began to make incriminating statements.

### iii. *Other claims*

Defendant points to additional circumstances arising subsequent to his first interrogation to support his challenge to the voluntariness of his incriminating third and fourth statements. He claims that he was kept incommunicado until after he admitted his participation in the murder, and that he endured the coercive effects of prolonged custody, repeated interrogation, and delay in arraignment. He claims his incriminating third and fourth statements were the product of these circumstances.

We agree with respondent that the record is devoid of evidence suggesting that defendant was kept incommunicado between March 25 and March 28, 1989. Moreover, although prolonged interrogation may be coercive in some circumstances (see *Mincey v. Arizona* (1978) 437 U.S. 385, 398–399 [57 L.Ed.2d 290, 98 S.Ct. 2408]), defendant was not subjected to prolonged interrogation.[2] The first interrogation lasted approximately half an hour. The second lasted approximately five minutes. The third—initiated by defendant—lasted approximately 10 minutes. The fourth lasted approximately half an hour.

We reached a similar conclusion in *People v. Rundle, supra,* 43 Cal.4th 76, in explaining that the defendant had not been subjected to a single lengthy interview, but instead underwent a series of interviews interrupted by significant breaks. (*Id.* at p. 123; see also *Jackson v. McKee* (6th Cir. 2008) 525 F.3d

---

[2] Defendant relies upon portions of Detective Knebel's trial testimony in support of the claim that he was kept incommunicado between his arrest on March 25 and his statements on March 28, 1989. The cited testimony, however, constitutes *trial* testimony that merely recounts the officer's contacts with defendant and does not touch upon the question whether defendant was permitted any *other* contacts during that time. At the *evidentiary hearing* that was conducted to determine the admissibility of the statements, there was no suggestion that defendant had been denied visits or other contacts with persons other than the investigating officers.

430, 434.) In addition, as in *Rundle*, there was no evidence suggesting that "authorities exploited any 'slowly mounting fatigue' resulting from prolonged questioning, or that such fatigue occurred or played any role in defendant's decision to confess." (*People v. Rundle, supra,* 43 Cal.4th at p. 123.)

Defendant also refers to the coercive effect of prolonged custody, pointing to the period between his arrest on Saturday, March 25 and Tuesday, March 28, 1989. As defendant observes, he had not been arraigned at the time he gave his third and fourth statements, when he began incriminating himself.

■ Persons in custody must be arraigned without unnecessary delay. (Cal. Const., art. I, § 14; *County of Riverside v. McLaughlin* (1991) 500 U.S. 44, 56–57 [114 L.Ed.2d 49, 111 S.Ct. 1661] [probable cause determination ordinarily should occur within 48 hours of a warrantless arrest]; see §§ 825 [arraignment ordinarily should occur within 48 hours, excluding Sundays and holidays], 859 [appearance before a magistrate should occur without unreasonable delay after charge by written complaint]; *People v. Hughes* (2002) 27 Cal.4th 287, 325 [116 Cal.Rptr.2d 401, 39 P.3d 432].)

In the present case, however, the defense did not assert in the trial court that defendant's statements were involuntary because of any delay in arraignment, and this assertion is forfeited on appeal, because the omission deprived the prosecution of the opportunity to justify any delay. (*People v. Lewis* (2008) 43 Cal.4th 415, 445 [75 Cal.Rptr.3d 588, 181 P.3d 947].) In any event, on appeal defendant fails to demonstrate an " 'essential connection between the illegal delay and the confession.' " (*People v. Thompson* (1980) 27 Cal.3d 303, 330 [165 Cal.Rptr. 289, 611 P.2d 883].) Defendant himself initiated the incriminating statement he made to Knebel on the second court day after his arrest. There is no evidence indicating that his eventual willingness to make admissions was caused by prolonged custody. Rather, as noted, it is quite apparent that his ultimate decision to inculpate himself followed his realization that his vehicle bore incriminating evidence of a collision and, even more significantly, that his hand appeared to have suffered a burn. As the trial court commented, defendant crafted accounts intended to address the incriminating evidence. (See *People v. Carrington, supra,* 47 Cal.4th at pp. 170–171 [confession was prompted by confrontation with incriminating evidence, not by an asserted reference to leniency made an hour prior to the confession].)[3]

Defendant suggests that although he did not react to law enforcement tactics during the first interrogation, those tactics produced results in his

---

[3] Defendant cites *Arizona v. Roberson* (1988) 486 U.S. 675, 686 [100 L.Ed.2d 704, 108 S.Ct. 2093], for the proposition that the lapse of three days between an "unsatisfied request for counsel and the [subsequent] interrogation" creates a presumption of coercion despite subsequently renewed *Miranda* advisements. We have concluded, however, that defendant did not communicate an unsatisfied request for counsel.

subsequent statements. Defendant claims the asserted tactic of minimizing his responsibility became effective at a later time, because that tactic led him to state during the final interview that, although he had driven the victim's automobile and helped set it on fire, he did not know that the victim was in the trunk. We have not found the questioning to have been coercive. In any event, the officers' suggestion was that defendant participated in the homicide but did not intend to kill the victim, whereas the response upon which defendant relies consisted of continued denial of any knowledge of or responsibility for her death.

Defendant suggests that when Salgado asked him during the final interview why he and Kelley used a firearm, "[t]his [apparent minimizing of responsibility] led to [defendant's] final admission that the firearm was his, and that he and Loretta [Kelley] had robbed the woman and put her in the trunk of her car. [Citation.] By pushing defendant to first admit to the less serious crimes, they were able to later pressure [defendant] into the full confession of robbery and murder." He also attempts to demonstrate that use of the "good cop bad cop" routine produced his last two statements, asserting that because Salgado had acted the role of the "good cop," defendant began his final interview with the question directed to Salgado: "You said you could help me; how can you help?" Defendant continues: "Kept isolated, with only the police officers available to him, [defendant] sought out 'help' from the only person left, the 'friendly' cop."

■■■ This claim is flawed, because there was nothing improper in Salgado's query concerning the firearm. Salgado merely responded to defendant's claim—that defendant innocently accepted a ride with Kelley and left fingerprints on her vehicle, then found it necessary to destroy the vehicle by fire because he believed it was stolen—with the natural question of why, if this account was true, defendant was armed. Nor is it inherently coercive for an interrogator to attempt to form a rapport with the suspect. There is no evidence apart from defendant's own testimony, which the trial court discredited, indicating that the officers promised leniency or assistance in return for an incriminating statement by defendant.

In a supplemental reply brief, defendant contends that this court's decision in *People v. Neal, supra,* 31 Cal.4th 63, supports his claim that his "decision to initiate further dialogue with the police, and his resulting confession, were both involuntary." As we noted in connection with our analysis of defendant's *Miranda* claim, the *Neal* decision is distinguishable. The defendant in that case clearly invoked his right to counsel, but the police disregarded the invocation pursuant to departmental policy, and the young, inexperienced defendant was subjected to food deprivation and lengthy interrogation. (*Neal,* at p. 84.) We have found no invocation of rights by defendant and no

suggestion that the coercive features attributed by defendant to the first interrogation caused him to incriminate himself at a later point.

■ Defendant also asserts the third and fourth statements were the tainted product of *Miranda* violations he claims occurred at the first and second interrogations. We have rejected defendant's *Miranda* claim, but even if it had merit, we would observe that defendant *initiated* the third interview (see *Edwards v. Arizona, supra,* 451 U.S. at p. 484) and was informed of and waived his rights prior to the third and fourth interviews. Even when a first statement is taken in the absence of proper advisements and is *incriminating,* so long as the first statement was voluntary a subsequent voluntary confession ordinarily is not tainted simply because it was procured after a *Miranda* violation. Absent "any actual coercion or other circumstances calculated to undermine the suspect's ability to exercise his free will," a *Miranda* violation—even one resulting in the defendant's letting "the cat out of the bag"—does not "so taint[] the investigatory process that a subsequent voluntary and informed waiver is ineffective for some indeterminate period." (*Oregon v. Elstad* (1985) 470 U.S. 298, 309, 311 [84 L.Ed.2d 222, 105 S.Ct. 1285]; see also *People v. Storm* (2002) 28 Cal.4th 1007, 1033 [124 Cal.Rptr.2d 110, 52 P.3d 52].) Rather "there is no warrant for presuming coercive effect where the suspect's initial inculpatory statement, though technically in violation of *Miranda,* was voluntary. The relevant inquiry is whether, in fact, the second statement was also voluntarily made." (*Oregon v. Elstad, supra,* 470 U.S. at p. 318, fn. omitted; see also *People v. San Nicolas* (2004) 34 Cal.4th 614, 639 [21 Cal.Rptr.3d 612, 101 P.3d 509] [" 'A subsequent administration of *Miranda* warnings to a suspect who has given a voluntary but unwarned statement ordinarily should suffice to remove the conditions that precluded admission of the earlier statement.' "].) This is not a case in which it is alleged that the officers were following a policy of disregarding the teaching of *Miranda.* (See *People v. Neal, supra,* 31 Cal.4th at pp. 81–82; see also *Missouri v. Seibert* (2004) 542 U.S. 600, 609, 615 [159 L.Ed.2d 643, 124 S.Ct. 2601] (plur. opn. of Souter, J.); *id.,* at pp. 617–618 (conc. opn. by Breyer, J.); *id.,* at pp. 618–622 (conc. in judgment of Kennedy, J.).) As we have concluded, the first statement was voluntary, and defendant's challenges to the voluntariness of the third and fourth statements cannot be sustained.

Finally, defendant contends the trial court erred in failing to make factual findings and to consider the totality of the circumstances with respect to its determination of voluntariness. We are not persuaded. The trial court placed upon the record the circumstance that its ruling was based upon its consideration of tape-recorded interrogations and the testimony of the witnesses, and referred to a number of salient facts. The court was not required to make any particular factual findings, and certainly cannot be faulted for failing to make findings addressing the claims raised by defendant for the first time on appeal. As noted, at trial defense counsel did not rely upon any evidence

other than defendant's claim he had been promised a maximum 18-year prison sentence in return for parroting incriminating evidence supplied to him by the police.

 Considering the totality of the circumstances, we conclude that defendant's ultimate decision to admit his culpability was voluntary.

### 2. Admissibility of Testimony of Margaret Williams

Defendant contends that the trial court erred in permitting Margaret Williams to testify for the prosecution at trial. According to defendant, the asserted coercion by the officers at her interrogation on March 25, 1989, rendered her statement involuntary. Defendant claims the coercive interview in turn infected her trial testimony more than three years later, in violation of defendant's right to a fair trial as guaranteed by the due process clause of the United States Constitution.

### a. Factual background

Prior to the preliminary hearing, the magistrate concluded that Margaret Williams, who was arrested on March 25, 1989, was subjected to a coercive interrogation by Detectives Salgado and Knebel, but that she nonetheless would be permitted to testify at the hearing. The trial court reached the same conclusion with respect to her trial testimony.

The claimed coercion occurred under the following circumstances. At her March 25, 1989 interview, Williams waived her rights to counsel and to remain silent. She denied any knowledge relevant to the crimes. The police interrogators repeatedly accused her of lying. They asked whether she was afraid, and when she denied any fear, they asked: "So you're not afraid to go to jail?" When she responded in the negative, Salgado asked: "Well what about the kids?" After further interrogation, Knebel commented: "OK, let me tell you the bottom line, you are in a lot of trouble." Salgado confirmed this was so. When Williams asked: "For what?" Knebel stated twice that she would be booked for first degree murder. He refused her request to telephone her mother, telling her she would be permitted to make the call after she spoke to the interrogating officers. Williams began to weep, referred to her children, and asserted she knew nothing concerning the murder. Salgado informed her he did not believe she had killed anyone, but that the law would treat her the same way as the actual perpetrator if "you know something that you're not telling us." The officers repeated that she was "in a lot of trouble" and that "Jesus said the truth will set you free." Knebel added that he did not believe she committed the crime but that he believed she knew who did and was "a witness to what happened." They cautioned her not to go to jail in

place of the actual perpetrators. After further interrogation in which Williams denied relevant knowledge, Knebel stated: "Alright. You are going to be in jail. There is no bail." After additional denials on the part of Williams, Knebel stated that Williams was "going to be up in jail for the . . . next whatever . . . cause I've got to go file murder one on you . . . Monday." Knebel commented that she would be in jail until she did "what Jesus said was right." Williams exclaimed that she did not want to be in jail for murder. Salgado directed her to relax and urged her to tell the truth, adding, "We don't want you, we want the person that did this. You know that. So just tell us the truth."

Williams asked what the officers wanted her to tell them, "[c]ause I want to go home." When she supplied a partial statement concerning defendant's movements and statements on the night of the crimes, Salgado stated: "It's OK, this is what we want . . . the truth, ok. Sweetheart now listen to me. Listen to me carefully. You're not in any trouble, OK. OK, you're not in any trouble—all we want is the truth." Williams responded with a more complete account of defendant's movements and statements.

A second custodial interview was conducted on March 28, 1989, but was not tape-recorded. According to the report on this interview prepared by Knebel, after the officers reminded Williams of her rights, she acknowledged she wished to speak with them. Knebel reported that in the second interview, "she said basically the same thing," but with more detail. She gave a full statement that was consistent with her preliminary hearing and trial testimony.

Prior to the preliminary hearing, the defense argued that Margaret Williams's testimony should be excluded because it was tainted by coercive police interrogation. The defense relied upon the circumstances that the officers had threatened Williams repeatedly with prosecution for murder, that they warned her she would remain in custody and would be unable to see her children until she "told the truth," and that they played upon her religious beliefs.

The magistrate appointed counsel for Williams, and required the People to commit to writing their informal grant to her of transactional immunity. Her independent counsel represented to the magistrate that she intended to testify, understood the immunity agreement, and was testifying "voluntarily and without coercion."

The magistrate also admitted the transcript of an interview that the prosecutor conducted with Williams on December 4, 1989, in preparation for

the preliminary hearing. The transcript contained the prosecutor's assertion that "no one is threatening Margaret to be here and no one has made any promises to her. She is here because she is subpoenaed and I have asked her to come to cooperate because of the seriousness of the charges." Williams confirmed that the prosecutor's statement was correct, and in the presence of her mother and Knebel she recounted the substance of her knowledge regarding the crimes.

Williams testified at the hearing conducted prior to defendant's preliminary hearing that, although she did not wish to become involved in the case, she was not threatened at all, and specifically was not threatened with arrest for murder during the interview with the prosecutor and Knebel, did not believe she was going to be arrested or otherwise prevented from returning home after giving her statement, and voluntarily answered the prosecutor's questions. She added that no one told her what to say during the interview. She explained that she understood she would be jailed if she failed to honor the subpoena, that her attorney had explained her rights regarding testifying and that, after conferring with her attorney, she informed the prosecutor she was willing to testify in the case.

Under examination by defense counsel, Williams added that on March 25, 1989, she had been frightened by the threat made by Salgado and Knebel that she would be kept in custody and prosecuted for murder and that, if she had a choice, she would prefer not to testify. She believed that law enforcement officers "have power on the streets," and added that she lived on the streets. She testified that she was still "in some way" afraid of the officers and did not believe she would be "left alone" by them if she cooperated, but felt that if she did not cooperate, the officers would "bother" her.

The magistrate agreed with the defense that Williams had been subjected to improper coercion on March 25, 1989, but concluded the effect of this coercion had become attenuated. In explanation, the magistrate referred to Williams's status as a third party witness who was subject to cross-examination by the defense. The court also relied upon the time that had elapsed between the interrogation and the preliminary examination, and the magistrate's observation of her testimony concerning her willingness to testify. The court added that, although the witness would not have appeared in court voluntarily, this was true of the great majority of witnesses, and that Williams had obeyed the subpoena despite her reluctance.

When the defense objected that the immunity agreement did not exempt the witness from arrest for perjury, leaving the witness with the impression that she would be required to testify consistently with her statements to the officers in order to avoid prosecution for perjury, the court found that the

witness "is in no way subject to prosecution for these charges; that from reading everything . . . the police never had any case against her whatsoever; and after hearing her statements and knowing the facts of this prelim., there is no case against her; and that she is subject to the same conditions as anyone who testifies . . . ." Williams testified at the preliminary hearing consistently with her statements to the law enforcement officers.

At trial, the People, anticipating a defense challenge to the admissibility of Williams's testimony, sought a ruling on this issue pursuant to Evidence Code section 402. The defense subsequently made an oral motion to exclude her testimony, contending that the effect of the police coercion was not attenuated. The trial court commented that the interrogation "looked more like a game of wits between someone who knew what they were doing [and] a couple of detectives that knew what she was doing, and didn't use the best of tactics." The court, critical of the detectives' use of Williams's concern for her children and her religious beliefs, agreed with the magistrate that Williams had been subjected to coercive interrogation, but also agreed that any taint already had been dispelled by the time of the preliminary examination—long before the trial. The court relied upon the lapse of time, as well as the circumstances that the witness had been released from custody days after the police interrogation and that the magistrate had appointed counsel for her. The trial court also referred to the magistrate's evident belief, based upon observations of the witness while testifying, that she was testifying freely and voluntarily and that she did not "feel under the coercion of the police or anybody else."

### b. *Discussion*

As noted, on appeal defendant claims that the taint of the initial police coercion infected Williams's trial testimony, in violation of defendant's right to a fair trial as guaranteed by the due process clause of the United States Constitution. We are not persuaded.

▮▮▮ Defendants have limited standing to challenge the trial testimony of a witness on the ground that an earlier out-of-court statement made by the witness was the product of police coercion. Indeed, defendants generally lack standing to complain that a police interrogation violated a third party witness's Fifth Amendment privilege against self-incrimination or Sixth Amendment right to counsel, nor may a defendant complain that law enforcement officers violated a third party witness's Fourth Amendment rights. (*People v. Badgett* (1995) 10 Cal.4th 330, 343 [41 Cal.Rptr.2d 635, 895 P.2d 877].) A defendant may assert a violation of his or her own right to due process of the law and a fair trial based upon third party witness coercion, however, if the defendant can establish that *trial* evidence was

coerced or rendered unreliable by prior coercion and that the admission of this evidence would deprive the defendant of a fair trial. (*People v. Jenkins* (2000) 22 Cal.4th 900, 966, 969 [95 Cal.Rptr.2d 377, 997 P.2d 1044]; *People v. Badgett, supra,* 10 Cal.4th at pp. 347, 348.) Although the out-of-court statement itself may be subject to exclusion because coercion rendered it unreliable, it is more difficult for a defendant to establish that the court should exclude the witness's *trial testimony.* As we have explained, "[t]estimony of third parties that is offered at trial should not be subject to exclusion unless the defendant demonstrates that improper coercion has impaired the reliability of the testimony." (*People v. Badgett, supra,* 10 Cal.4th at p. 348.) The burden rests upon the defendant to demonstrate how the earlier coercion "directly impaired the free and voluntary nature of the anticipated testimony in the trial itself" (*People v. Boyer* (2006) 38 Cal.4th 412, 444 [42 Cal.Rptr.3d 677, 133 P.3d 581]) and impaired the reliability of the trial testimony (*People v. Badgett, supra,* 10 Cal.4th at p. 348).[4]

Our decision in *People v. Douglas* (1990) 50 Cal.3d 468 [268 Cal.Rptr. 126, 788 P.2d 640], disapproved on other grounds in *People v. Marshall* (1990) 50 Cal.3d 907, 933, footnote 4 [269 Cal.Rptr. 269, 790 P.2d 676], is instructive. In that case we considered the testimony of a third party witness who had been beaten by Mexican police officers during interrogation. The interrogating officers informed him he would face "worse treatment" that evening. When armed officers reappeared in the evening and announced they were taking him to the beach, he feared for his life and confessed. The resulting confession was not admitted in evidence at trial, but the witness testified for the prosecution. We concluded that the defendant failed to establish that the witness's *trial testimony* was coerced. Various circumstances were relevant to our decision. The witness no longer was in the custody of the Mexican police and was not mistreated by California police officers; he testified under a grant of immunity after consultation with independent counsel; the immunity agreement required only that the witness testify truthfully concerning the charged murders—there was no requirement that he testify consistently with his prior statement; and the witness claimed he was testifying voluntarily and not under compulsion of the statements he made in Mexico. In support of the view that the coercion did not deprive the defendant of a fundamentally fair trial, we also pointed to the ability of the defense to cross-examine and impeach the witness. (*People v. Douglas,* at p. 502.)

Defendant, like the defendant in *People v. Douglas, supra,* 50 Cal.3d 468, fails to demonstrate that Margaret Williams's trial testimony was improperly

---

[4] We need not examine the outer limits of the rule limiting standing to assert coercion of a third party witness when the coercion tests "the integrity of the judicial system," because such extreme circumstances as " ' "torture or . . . other conduct belonging only in a police state" ' " are not present in this case. (*People v. Jenkins, supra,* 22 Cal.4th at p. 968; see *People v. Badgett, supra,* 10 Cal.4th at p. 347.)

coerced or that any coercion arising from the earlier police interrogation of the witness impaired the reliability of her trial testimony. The statement found to be the product of coercion was not admitted at trial. Moreover, at trial the defense did not make an offer of proof or present any evidence on the issue of *ongoing* coercion of Margaret Williams between the time of the preliminary hearing, which was conducted in December 1989, and the trial, which was conducted two and a half years later, in August 1992. Rather, defense counsel merely relied upon the record established at the time of the preliminary hearing.

We agree with the court below that the coercive effect of the interrogation was dissipated in part by the length of time that elapsed between the interrogation and the witness's testimony—nine months in the instance of the preliminary hearing and more than three years in the instance of the trial. We also agree that because the witness had been released from custody soon after the interrogation (long before she testified at the preliminary hearing and the trial), remained free from custody during trial, and no longer was separated from her children, no significant coercive impact would remain from the officers' threat a few days subsequent to the crime that she would be kept in custody and separated from her children until she made a truthful statement. In addition, it is not reasonable to conclude that the officers' threats during interrogation that she would be prosecuted for murder would have affected her trial testimony, because she testified at trial under a grant of immunity conditioned simply upon an agreement she would testify truthfully, having been counseled on the meaning of the immunity agreement by independent counsel. (See *People v. Douglas, supra*, 50 Cal.3d at p. 502.) Contrary to defendant's claim, the circumstance that immunity was conditioned on Williams's truthful testimony did not serve to coerce her into offering trial testimony identical to the statement she gave to the officers. (*Id.* at p. 502, fn. 7.) If consistency in a witness's account were to establish continuing coercion, prior coercion would render trial testimony inadmissible in almost all cases, without regard to the reliability of the testimony. Such is not the law, as we have explained above.

Defendant asserts that the mere passage of time does not cause a coerced witness's testimony to become reliable. Rather, he argues, at the time of trial Williams remained motivated by her fear of the law enforcement officers, fear that she would be separated from her children, and fear that she would be charged with murder. Accordingly, defendant maintains, she felt bound to repeat the same account she gave to the officers during interrogation. In support of his claim of continuing coercion, defendant relies upon Williams's testimony, at the time of the preliminary hearing and the trial, that she would have preferred to ignore the subpoena and avoid involvement in the capital trial, and that she mistrusted the authorities and harbored a general uneasiness

that she would suffer police harassment in the event she failed to testify in accordance with her earlier statements.

As we have pointed out, however, Williams had received immunity from prosecution, and this immunity was not conditioned upon the consistency of her trial testimony with her first statement. Moreover, she had independent counsel who could alleviate unreasonable fears and who, in fact, testified that Williams's preliminary hearing testimony was voluntarily given. Finally, we observe that the defense elected not to cross-examine Williams at trial, thereby voluntarily relinquishing the most powerful means in its arsenal for challenging the reliability of the witness's statements.

We also reject defendant's reliance upon the passing comment made by the magistrate at the preliminary hearing that Williams's testimony at that hearing "could very well have been the product of the 'original coercion' by the police." The magistrate ultimately concluded that her testimony was *not* tainted by the earlier coercion, a conclusion supported by substantial evidence. Moreover, the doctrines governing the exclusion of the "fruit" or product of a *defendant*'s involuntary confession do not apply when the claim is that a *third party* witness's statement was coerced. (*People v. Jenkins, supra,* 22 Cal.4th at p. 966; *People v. Badgett, supra,* 10 Cal.4th at p. 346.) Rather, as we have explained, "the defendant may prevail only by demonstrating fundamental unfairness at trial, normally by establishing that evidence to be produced at trial was made unreliable by coercion." (*People v. Jenkins, supra,* 22 Cal.4th at p. 966.) Defendant has not made such a demonstration.

### 3. *Accomplice Instructions*

Defendant contends there was evidence from which the jury could have concluded that Margaret Williams was an accomplice, requiring the trial court to deliver instructions cautioning the jury with respect to their reliance upon accomplice testimony. (See CALJIC Nos. 3.10, 3.11, 3.12, 3.18.)

An accomplice is "one who is liable to prosecution for the identical offense charged against the defendant on trial in the cause in which the testimony of the accomplice is given." (§ 1111.)

"The general rule is that the testimony of all witnesses is to be judged by the same legal standard. In the case of testimony by one who might be an accomplice, however, the law provides two safeguards. The jury is instructed to view with caution testimony of an accomplice that tends to incriminate the defendant. It is also told that it cannot convict a defendant on the testimony of an accomplice alone." (*People v. Howard* (2008) 42 Cal.4th 1000, 1021–1022 [71 Cal.Rptr.3d 264, 175 P.3d 13], italics omitted; see § 1111

[accomplice testimony must be corroborated by "other evidence as shall tend to connect the defendant with the commission of the offense"].)

Error in failing to instruct the jury on consideration of accomplice testimony at the guilt phase of a trial constitutes state-law error, and a reviewing court must evaluate whether it is reasonably probable that such error affected the verdict. (*People v. Wisenhurst* (2008) 44 Cal.4th 174, 214 [79 Cal.Rptr.3d 125, 186 P.3d 496].)

Any error in failing to instruct the jury that it could not convict defendant on the testimony of an accomplice alone is harmless if there is evidence corroborating the accomplice's testimony. " 'Corroborating evidence may be slight, may be entirely circumstantial, and need not be sufficient to establish every element of the charged offense.' " (*People v. Williams* (2008) 43 Cal.4th 584, 636 [75 Cal.Rptr.3d 691, 181 P.3d 1035].)

As defendant points out, there was evidence before the jury that a confidential informant informed the police that Margaret Williams had stated she had been paid to purchase gasoline for the purpose of burning a vehicle and to serve as a lookout while the vehicle was being burned. He contends the evidence suggested she was liable for prosecution for murder as an aider and abettor.

Whether or not the evidence implicated Margaret Williams as an aider and abettor to the extent that the court should have delivered accomplice instructions, it is not reasonably probable the result at defendant's trial would have been different absent such error. The jury would have been inclined to view her testimony with caution even in the absence of an instruction that it do so, because the jury was aware from Detective Knebel's testimony that Williams had been arrested in connection with the murder investigation after the authorities learned from an informant that Williams had an outstanding arrest warrant for assault; that Williams had been contacted by defendant and Loretta Kelley immediately after the crimes and had driven them to their destinations after their criminal activity; and that Williams had testified—reluctantly—under a grant of immunity. Moreover, Williams's testimony was corroborated by defendant's own statements, along with inferences that could be drawn from evidence suggesting he had suffered a burn on his hand about the time the crime was committed, that he, like the driver described by Carrie Runnels, sported shoulder-length black hair at the time of the crime, that the bullet found near the scene was consistent with a bullet found at his residence, and that a bracelet consistent with his description of the robbery proceeds was discovered in a storm drain in which he claimed to have disposed of it. Accordingly, any error was harmless.

### 4. *Instruction Pursuant to Former CALJIC No. 2.11.5.*

Defendant contends that the trial court erred in delivering former CALJIC No. 2.11.5 without amendment. The pattern instruction as given at trial read as follows: "There has been evidence in this case indicating that a person other than defendant was or may have been involved in the crime for which the defendant is on trial. [¶] There may be many reasons why such person is not here on trial. Therefore, do not discuss or give any consideration as to why the other person is not being prosecuted in this trial or whether he or she has been or will be prosecuted. Your sole duty is to decide whether the People have proved the guilt of the defendant on trial."

Defendant observes that this instruction should not be used if the "other person" is a witness who testified at trial, because the jury is " 'entitled to consider the lack of prosecution in assessing the witness's credibility.' " (*People v. Williams* (1997) 16 Cal.4th 153, 226 [66 Cal.Rptr.2d 123, 940 P.2d 710].) Defendant complains that in delivering this instruction, the trial court failed to distinguish between two persons to whom the jury could have believed the instruction pertained—Margaret Williams and Loretta Kelley. He argues that the jury may have concluded—incorrectly—that the instruction referred to Margaret Williams, and thereby avoided considering a factor relevant to her credibility as a witness.

At trial, defense counsel did not seek modification of the instruction. (See *People v. Hudson* (2006) 38 Cal.4th 1002, 1011–1012 [44 Cal.Rptr.3d 632, 136 P.3d 168] [" 'Generally, a party may not complain on appeal that an instruction correct in law and responsive to the evidence was too general or incomplete unless the party has requested appropriate clarifying or amplifying language.' "]; but see *People v. Prieto* (2003) 30 Cal.4th 226, 247 [133 Cal.Rptr.2d 18, 66 P.3d 1123] [instructional error that affects the defendant's substantial rights may be reviewed on appeal despite the absence of an objection].) Indeed, defense counsel *stipulated* that the court and counsel had reviewed the instructions proposed by the court and that the instructions had been agreed to by all counsel. (See *People v. Davis* (2005) 36 Cal.4th 510, 567 [31 Cal.Rptr.3d 96, 115 P.3d 417] [discussing invited instructional error].)

In any event, in *People v. Crew* (2003) 31 Cal.4th 822 [3 Cal.Rptr.3d 733, 74 P.3d 820], also a case in which accomplice instructions were not given, we rejected an identical claim. In that case a witness may have been a participant in the charged crime and was granted immunity from prosecution. The court nonetheless instructed in the terms of CALJIC No. 2.11.5. We concluded that "the giving of CALJIC No. 2.11.5 is not error when it is given together with other instructions that assist the jury in assessing the credibility of witnesses. [Citation.] That occurred here, where the trial court instructed

the jury it could consider any evidence of witness credibility, including the existence or nonexistence of a bias, interest, or other motive (CALJIC No. 2.20), and to consider the instructions as a whole (CALJIC No. 1.01). [Citation.] In addition, in closing argument to the jury, defense counsel expressly mentioned [the witness's] grant of immunity as a ground for impugning [the witness's] testimony." (*People v. Crew, supra,* 31 Cal.4th at p. 845.) The court in the present case delivered the same general instructions on evaluating witness credibility that were delivered in *People v. Crew, supra,* 31 Cal.4th 822, and in his closing statement defense counsel argued that Margaret Williams's credibility should be evaluated in light of the immunity from prosecution that had been afforded to her.

## B. *Penalty Phase*

### 1. *Prior Felony Conviction Instruction*

Defendant contends that the trial court erred in failing to instruct the jury that it could consider his prior felony convictions as a circumstance in aggravation under section 190.3, factor (c), only if it was satisfied beyond a reasonable doubt that he had suffered those convictions. In the present case, the court instructed the jury on a lesser standard of proof with respect to prior felony convictions, namely the preponderance-of-the-evidence standard. Defendant contends that this omission violated his right to a fair and reliable penalty phase determination under applicable state law, assertedly in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution.[5]

 The opinions of this court include inconsistent statements concerning the standard of proof applicable to evidence of prior convictions admitted under section 190.3, factor (c). Some refer to the beyond-a-reasonable-doubt standard (see *People v. Harris, supra,* 37 Cal.4th 310, 360; see also *People v. Martinez* (2009) 47 Cal.4th 399, 455 [97 Cal.Rptr.3d 732, 213 P.3d 77]; *People v. Cruz, supra,* 44 Cal.4th at p. 681; *People v. Millwee* (1998) 18 Cal.4th 96, 161, fn. 30 [74 Cal.Rptr.2d 418, 954 P.2d 990]; *People v. Robertson* (1982) 33 Cal.3d 21, 53–56, fn. 19 [188 Cal.Rptr. 77, 655 P.2d 279]; and see Use Note to CALJIC No. 8.86 (Spring 2010 ed.) p. 505 & Bench Notes to CALCRIM No. 765 (2009–2010) p. 567, citing *People v. Davenport* (1985) 41 Cal.3d 247, 280–281 [221 Cal.Rptr. 794, 710 P.2d 861]), whereas some decisions indicate that the beyond-a-reasonable-doubt instruction is *not* required when proof of the fact of conviction, rather than evidence of underlying criminal activity admissible pursuant to section 190.3,

---

[5] Although respondent takes inconsistent positions on the issue of forfeiture of this claim, when the instruction is applicable it should be delivered on the court's own motion. (*People v. Harris* (2005) 37 Cal.4th 310, 360 [33 Cal.Rptr.3d 509, 118 P.3d 545].)

factor (b), is involved. (See *People v. Kennedy* (2005) 36 Cal.4th 595, 637 [31 Cal.Rptr.3d 160, 115 P.3d 472]; *People v. Pinholster* (1992) 1 Cal.4th 865, 965 [4 Cal.Rptr.2d 765, 824 P.2d 571]; *People v. Wright* (1990) 52 Cal.3d 367, 437 [276 Cal.Rptr. 731, 802 P.2d 221]; *People v. Morales* (1989) 48 Cal.3d 527, 566 [257 Cal.Rptr. 64, 770 P.2d 244]; *People v. Gates* (1987) 43 Cal.3d 1168, 1202 [240 Cal.Rptr. 666, 743 P.2d 301].)

Upon reflection, we have concluded that as a matter of state law, juries should be instructed upon the beyond-a-reasonable-doubt standard as to section 190.3, factor (c) evidence. The applicability of this standard is well settled with respect to evidence of prior violent criminal activity admitted pursuant to section 190.3, factor (b), and in our view juries may find it difficult to understand the technical distinction between the two types of evidence of prior criminality and to apply differing standards to them. To the extent a contrary conclusion is suggested by language in prior decisions, those decisions are disapproved. (See, e.g., *People v. Kennedy, supra,* 36 Cal.4th 595, 637; *People v. Pinholster, supra,* 1 Cal.4th 865, 965; *People v. Wright, supra,* 52 Cal.3d 367, 437; *People v. Morales, supra,* 48 Cal.3d 527, 566; *People v. Gates, supra,* 43 Cal.3d 1168, 1202.)

Although we agree with defendant that the jury should have been instructed to apply the higher standard, we agree with respondent that the error was harmless. The error claimed by defendant constitutes a violation of state law, not federal constitutional law. (*People v. Avena, supra,* 13 Cal.4th 394, 429; see *People v. Robertson, supra,* 33 Cal.3d at p. 53.) In reviewing this type of error occurring at the penalty phase of a trial, we consider whether it is reasonably possible that the omission affected the verdict. (*People v. Kennedy, supra,* 36 Cal.4th at p. 636.)

Defendant contends he was prejudiced because the jury may have relied upon the 1983 and 1981 convictions in reaching the verdict of death even though it was not persuaded beyond a reasonable doubt that he suffered those convictions.

It is inconceivable, however, that the jury would have had the remotest doubt that defendant suffered the 1983 rape and burglary convictions. The evidence demonstrating the fact of the convictions was uncontradicted. Defendant did not challenge the validity of the prior convictions at trial. Indeed, outside the presence of the jury he stipulated that he had suffered the 1983 convictions, for the purpose of the prior-prison-term and prior-serious-felony enhancement allegations. (See §§ 667, subd. (a), 667.5.) A certified copy of the record of the 1983 convictions was admitted into evidence (with defense counsel's concurrence), thereby establishing the truth of the prior conviction allegation. (See *People v. Prieto, supra,* 30 Cal.4th at pp. 258–259.)

Defendant's recorded statements to Officers Knebel and Salgado discussing the prior prison term for rape and burglary were admitted into evidence at the penalty phase. Defendant's wife testified for the defense that defendant had produced prize-winning art during his incarceration in the 1980's, and under cross-examination she acknowledged her awareness that he had been in prison for rape and burglary at that time.

With this level of proof, and the complete absence of any controversy in the trial court related to this matter, the asserted instructional error concerning the 1983 convictions could not have affected the penalty phase verdict. (See *People v. Harris, supra,* 37 Cal.4th at p. 360 [relying upon the defendant's statement concerning the conviction, and the stipulated admission of documentary evidence].) In addition, the substance of the criminal conduct and the evidence concerning defendant's plea of guilty came before the jury by means of live testimony, creating a far more formidable aggravating impact under section 190.3, factor (b) (evidence of prior violent criminal activity), than the mere record of conviction. Defendant does not contend that the factor (b) evidence was admitted erroneously, and the court correctly instructed the jury that such evidence could not be considered unless the jury found beyond a reasonable doubt that the activity actually occurred.

With respect to the evidence of a prior conviction in 1981 for attempted burglary, it is similarly inconceivable that the jury could have entertained any doubt concerning whether defendant suffered the conviction. In the presence of the jury, the prosecutor offered documentary evidence establishing that in 1981 defendant had been convicted of a felony, namely the crime of attempted residential burglary, and had been sentenced to the former California Youth Authority (CYA). When the court inquired whether defense counsel had any objection to this evidence, he responded in the negative. During cross-examination, defendant's wife acknowledged that defendant had been committed to CYA. No defense evidence disputing the prior conviction was offered.

The documentary evidence consisted of three items. The first was a certified copy of a Los Angeles County Superior Court docket sheet captioned "The People of the State of California vs. David Earl Williams," noting the date the complaint was filed and that the charge was one count of violating section 459 (burglary) committed on November 30, 1980; that the accused "PG"—undoubtedly, pleaded guilty—to an attempted burglary; that the matter was set for "P & S"—presumably, probation report and sentencing; and that at the "P & S" hearing, he was denied probation and was committed to CYA for a three-year term, with credit for time served.

The second item of proof was a copy of an information bearing the same caption (evidencing prosecution as an adult) and docket number, charging a

felony, namely nighttime entry into an occupied residence with the intent to commit larceny—the offense having been committed on the same date as the crime charged in the docket sheet.

The third item of evidence was a letter from a CYA file supervisor, bearing the same docket number and stating that on a date three days after the sentencing date noted in the docket sheet, David Earl Williams "was committed to the Youth Authority by the Superior Court of Los Angeles County for attempted burglary* and was discharged from the Youth Authority on July 14, 1983," but that the "regular material" was not available because the "subject" had been discharged and office policy was that case files for "discharged wards" were discarded after seven years. Below the text an asterisk appears with the notation "2nd."[6]

Defendant claims the docket sheet and other items of proof may not have referred to him, but to another person bearing the same name, but this speculative claim does not alter our conclusion. The prosecutor offered the documents into evidence for the purpose of establishing *defendant's* 1981 felony conviction, and the application of the documents to defendant was undisputed. Defendant's full name was listed on each document, his residence was listed as Pasadena, and defendant's wife acknowledged he had been committed to CYA before he reached 21 years of age.

We note, in addition, that the evidence of the 1981 conviction was of minor importance compared with the properly admitted evidence in aggravation, including the facts of the charged crime and the testimony concerning defendant's brutal 1983 offenses. Even when evidence *improperly* has been admitted under section 190.3, factor (c)—an error that did *not* occur in the present case—the error may be harmless when the evidence is trivial in comparison with the other properly admitted evidence in aggravation. (See *People v. Burton* (1989) 48 Cal.3d 843, 863–864 [258 Cal.Rptr. 184, 771 P.2d 1270].)

Defendant suggests that because the letter from the CYA file supervisor referred to the discharge of "wards," the evidence "raised the possibility that, if there had been such a conviction, it may have involved a juvenile matter." As he asserts, juvenile adjudications generally are not admissible under section 190.3, factor (c). (*People v. Lewis, supra,* 43 Cal.4th at p. 530.) Although the

---

[6] If the notation refers to second degree burglary, the crime is a "wobbler"—a crime that may be punished as a misdemeanor or a felony. The conviction constitutes a felony unless and until the crime is reduced by the court to a misdemeanor. (*People v. Banks* (1959) 53 Cal.2d 370, 381–382 [1 Cal.Rptr. 669, 348 P.2d 102]; see *People v. Feyrer* (2010) 48 Cal.4th 426, 438–439 [106 Cal.Rptr.3d 518, 226 P.3d 998], and cases cited.) There is no indication the matter was reduced to a misdemeanor; defendant certainly did not claim as much at trial.

People correctly have argued that the issue was forfeited because it was not raised below (see *People v. Hawthorne* (2009) 46 Cal.4th 67, 92 [92 Cal.Rptr.3d 330, 205 P.3d 245]), they nonetheless inappropriately have conceded that it "appears admission of [defendant's] 1981 conviction or adjudication for attempted residential burglary was error." In his reply brief, defendant seizes upon this concession and argues that as a federal constitutional matter, the admission of such nonstatutory evidence in aggravation requires automatic reversal of the penalty verdict. On the contrary, we have reviewed such claims for harmless error (*People v. Lewis, supra*, 43 Cal.4th at p. 531), and in any event, the caption and other information on the docket sheet and the copy of the information overwhelmingly demonstrate that defendant was charged and convicted of attempted burglary as an adult. It is evident he was committed to CYA under the authority of former section 1731.5 of the Welfare and Institutions Code (Stats. 1981, ch. 476, § 1, p. 1816), which permitted the court to commit persons who were tried and convicted as adults, but were less than 21 years of age at the time of apprehension, to CYA as youthful offenders. (See *People v. King* (1993) 5 Cal.4th 59, 64–65 [19 Cal.Rptr.2d 233, 851 P.2d 27].) Even if he was a minor when he committed the offense, but was tried and *convicted* as an adult and sentenced to CYA as a youthful offender, the conviction would be admissible at the penalty phase under section 190.3, factor (c). (See *People v. Pride* (1992) 3 Cal.4th 195, 256–257 [10 Cal.Rptr.2d 636, 833 P.2d 643].) The evidence did not constitute nonstatutory evidence in aggravation.

■ Defendant insists that the asserted instructional omission reflects federal constitutional error requiring automatic reversal. We consistently have held, however, that the court's limited obligation to instruct the jury at the penalty phase on the beyond-a-reasonable-doubt standard is a matter of state law, and is not imposed by the federal Constitution. (*People v. Avena, supra*, 13 Cal.4th at pp. 429–432; *People v. Pinholster, supra*, 1 Cal.4th at p. 965, fn. 1; *People v. Benson, supra*, 52 Cal.3d at pp. 810–811.) Arguments substantially identical to defendant's have been rejected (*People v. Avena, supra*, 13 Cal.4th at pp. 429–432), and defendant offers no persuasive basis for reconsideration. Circumstances that render a defendant *eligible* for the death penalty are decided by a jury applying the proof-beyond-a-reasonable-doubt standard, but the penalty determination fundamentally is normative, rendering the standard required by the federal Constitution inapplicable. (*People v. Griffin* (2004) 33 Cal.4th 536, 595 [15 Cal.Rptr.3d 743, 93 P.3d 344]; *People v. Rodriguez* (1986) 42 Cal.3d 730, 777–779 [230 Cal.Rptr. 667, 726 P.2d 113]; see also *People v. Prieto, supra*, 30 Cal.4th at p. 263, and cases cited.)

Defendant claims that the effect of the asserted instructional error was that there never was a valid jury determination that he suffered any of the three convictions, claiming that the reasoning of the high court's decision in

*Sullivan v. Louisiana* (1993) 508 U.S. 275 [124 L.Ed.2d 182, 113 S.Ct. 2078] leads to the conclusion that the error is reversible per se. That decision, however, applied an automatic-reversal rule to a constitutionally deficient reasonable-doubt instruction on the issue of *guilt*. The decision does not purport to govern sentencing decisions such as those that occur at the penalty phase of a capital trial under California law. As discussed above, at the penalty phase of such a trial in California the defendant does not possess a federal constitutional right to have the jury base its findings on the sentencing factors upon the beyond-a-reasonable-doubt standard.[7]

Defendant asserts that the authority of this court to apply a harmless-error standard was eroded by *Apprendi v. New Jersey* (2000) 530 U.S. 466 [147 L.Ed.2d 435, 120 S.Ct. 2348]. We note that this decision *excluded* prior convictions from its requirement that facts increasing the penalty beyond the statutory maximum must be proven to the jury under a beyond-a-reasonable-doubt standard. (*Id.* at p. 490.) In any event, the *Apprendi* decision does not apply to factors considered by the jury under section 190.3. (*People v. Griffin, supra,* 33 Cal.4th at p. 595; *People v. Prieto, supra,* 30 Cal.4th at pp. 262–263.) The high court's decision in *Ring v. Arizona* (2002) 536 U.S. 584 [153 L.Ed.2d 556, 122 S.Ct. 2428] also is distinguishable, because that decision concerned factors that rendered the defendant *eligible* for the death penalty. The "argument rests on a misconception concerning the nature of California's capital sentencing scheme. '[T]he ultimate determination of the appropriateness of the penalty and the subordinate determination of the balance of evidence of aggravation and mitigation do not entail the finding of facts that can increase the punishment for murder of the first degree beyond the maximum otherwise prescribed.' " (*People v. Bonilla* (2007) 41 Cal.4th 313, 359 [60 Cal.Rptr.3d 209, 160 P.3d 84].)

### 2. *Asserted Prosecutorial Misconduct*

Defendant contends the prosecutor committed misconduct at the close of her penalty phase argument by invoking a biblical justification for imposing

---

[7] To the extent defendant claims the admission of evidence of his prior convictions was improper—because it consisted of bad-character evidence that was inadmissible in the prosecution's case-in-chief under section 190.3, factor (k), as interpreted in *People v. Boyd* (1985) 38 Cal.3d 762, 774–776 [215 Cal.Rptr. 1, 700 P.2d 782]—his argument lacks merit. We have observed: " 'The fact that evidence of defendant's previous violent crimes was also indicative of his character or mental condition does not render the evidence inadmissible.' " (*People v. Smith* (2005) 35 Cal.4th 334, 355 [25 Cal.Rptr.3d 554, 107 P.3d 229].) And contrary to defendant's suggestion that the prosecutor improperly relied upon the convictions as evidence of future dangerousness, a prosecutor may argue that a defendant will remain dangerous in the future, as long as such a claim is supported by evidence other than expert opinion testimony. (*People v. Bramit* (2009) 46 Cal.4th 1221, 1244 [96 Cal.Rptr.3d 574, 210 P.3d 1171].)

capital punishment. Defendant claims that the asserted misconduct violated defendant's Eighth Amendment right to a reliable sentencing determination, deprived him of a fair penalty trial, and amounted to an unconstitutional establishment of religion.

■■■ "[A]t the penalty phase a prosecutor commits misconduct under the federal standard by engaging in conduct that renders the trial so unfair as to constitute a denial of due process." (*People v. Dykes, supra*, 46 Cal.4th at p. 786; see *People v. Wallace* (2008) 44 Cal.4th 1032, 1091 [81 Cal.Rptr.3d 651, 189 P.3d 911].) Under state law, it constitutes reversible misconduct for the prosecutor to employ deceptive or reprehensible methods to persuade the court or the jury (*People v. Wallace, supra*, 44 Cal.4th at p. 1091), when "there is a reasonable possibility that without such misconduct, an outcome more favorable to the defendant would have resulted" (*People v. Riggs* (2008) 44 Cal.4th 248, 315 [79 Cal.Rptr.3d 648, 187 P.3d 363]; see *People v. Martinez, supra*, 47 Cal.4th at p. 955; *People v. Wallace, supra*, 44 Cal.4th at p. 1091). When the defense fails to object to asserted misconduct at trial and request that the jury be admonished, the claim ordinarily is forfeited on appeal. (*People v. Zambrano* (2007) 41 Cal.4th 1082, 1169 [63 Cal.Rptr.3d 297, 163 P.3d 4], disapproved on another point in *People v. Doolin, supra*, 45 Cal.4th 390, 420; *People v. Lewis and Oliver* (2006) 39 Cal.4th 970, 1060 [47 Cal.Rptr.3d 467, 140 P.3d 775]; *People v. Slaughter* (2002) 27 Cal.4th 1187, 1209 [120 Cal.Rptr.2d 477, 47 P.3d 262].)

Because there was no objection to the asserted misconduct in the present case, we conclude that the claim of misconduct was forfeited. A defense objection and an admonition by the court would not have been futile.[8] (See *People v. Hill* (1998) 17 Cal.4th 800, 820–821 [72 Cal.Rptr.2d 656, 952 P.2d 673].) In any event, as we shall explain, although the prosecutor's invocation

---

[8] Defendant contends that appellate courts in "almost all jurisdictions" reserve the power to reach a claim of error, otherwise forfeited below, when an error is plain and affects substantial rights of the accused. (See *Johnson v. United States* (1997) 520 U.S. 461, 466–467 [137 L.Ed.2d 718, 117 S.Ct. 1544]; Fed. Rules Crim.Proc., rule 52(b), 18 U.S.C.) An "effect on substantial rights" ordinarily requires some demonstration of prejudice, however. (*People v. Dykes, supra*, 46 Cal.4th at p. 775, fn. 8, citing *United States v. Olano* (1993) 507 U.S. 725, 734 [123 L.Ed.2d 508, 113 S.Ct. 1770].) As will be discussed, *post*, the biblical references of which defendant now complains were not prejudicial under any standard. We thus disagree with defendant's contention that our failure to address the merits of his claim would seriously affect the fairness, integrity, or public reputation of the legal proceedings. (See *People v. Wash* (1993) 6 Cal.4th 215, 277 [24 Cal.Rptr.2d 421, 861 P.2d 1107] (conc. & dis. opn. of Mosk, J.); see also *People v. Arias* (1996) 13 Cal.4th 92, 159–160 [51 Cal.Rptr.2d 770, 913 P.2d 980] [rejecting "plain error" argument where capital defendant neglected to preserve a claim of prosecutorial misconduct at trial].)

We note that defendant has withdrawn his claim that defense counsel's failure to object to asserted misconduct constituted ineffective assistance of counsel. He asserts that this claim properly should be considered in conjunction with his petition for writ of habeas corpus.

of religious authority crossed into impermissible argument, defendant fails to demonstrate that the remarks warrant reversal of the penalty verdict.

As part of a lengthy closing argument that explained the People's position on each of the factors in aggravation and mitigation and concluded that aggravating factors overwhelmingly outweighed the mitigating circumstances, the prosecutor invoked "shared common moral values" that she argued justified the law providing for capital punishment. She asked the jury to consider the unique value of the life defendant had extinguished, explaining that "we're not talking about an eye for an eye" or a "life for a life." She continued: "And don't think that you should have any religious scruples to not impose the death penalty. The Bible unambiguously commands that murderers be put to death. In Genesis it says: 'whoever sheds the blood of man shall his blood be shed, for in his image did God make man.' And also in Genesis it clearly states: man, not God is who is going to impose this penalty. When it says by man, it means, the murder[er]'s blood be shed. And in Exodus it says: 'He who fatally strikes the man shall be put to death.' And I'm sure that refers to women as well. It goes on to say: 'and you shall not take reparations for the soul of the murderer who deserves to die but he shall be put to death.' [¶] So ladies and gentlemen, even the Bible for those of you who may have some religious scruples does not say that you should not use your own moral beliefs in making [the] determination here."

Defense counsel, in his subsequent closing argument to the jury, made even more extensive use of religious imagery, including uncredited quotations from the Bible. For example, defense counsel (1) stated that the Judeo-Christian God, or at least a singular divine entity, imposes a definitive moral framework that the jurors must consider when judging a defendant; (2) paraphrased biblical passages from Deuteronomy 32:35, Romans 12:19, and Hebrews 10:30, among others, commonly cited for the principle that the Judeo-Christian God opposes capital punishment; and (3) concluded with the biblical story of the prodigal son from Luke 15:11–15:32, implying that, if the prodigal's father could welcome him back with open arms, the jury at least should grant the defendant a sentence of life imprisonment without the possibility of parole.

■■■ This court consistently has found that a prosecutor's reliance on religious authority as justification for imposing capital punishment is improper. (*People v. Roldan* (2005) 35 Cal.4th 646, 743 [27 Cal.Rptr.3d 360, 110 P.3d 289], disapproved on another point in *People v. Doolin, supra*, 45 Cal.4th at p. 420; *People v. Vieira* (2005) 35 Cal.4th 264, 298 [25 Cal.Rptr.3d 337, 106 P.3d 990]; *People v. Slaughter, supra*, 27 Cal.4th at p. 1210; *People v. Ervin* (2000) 22 Cal.4th 48, 100 [91 Cal.Rptr.2d 623, 990 P.2d 506]; *People v. Welch* (1999) 20 Cal.4th 701, 761–762 [85 Cal.Rptr.2d 203,

976 P.2d 754]; *People v. Roybal* (1998) 19 Cal.4th 481, 521 [79 Cal.Rptr.2d 487, 966 P.2d 521]; *People v. Hill, supra,* 17 Cal.4th at p. 836; *People v. Sandoval* (1993) 4 Cal.4th 155, 193 [14 Cal.Rptr.2d 342, 841 P.2d 862]; *People v. Wrest* (1992) 3 Cal.4th 1088, 1107 [13 Cal.Rpr.2d 511, 839 P.2d 1020].) The problem with such argument is that it tends to undermine the jurors' sense of responsibility for imposing a death sentence in a particular case, and "impl[ies] that another, higher law should be applied . . . displacing the law in the court's instructions." (*People v. Wrest,* at p. 1107.) It is permissible, however, for a prosecutor to invoke religious imagery when arguing that jurors should not reach a penalty verdict in reliance on divine teachings, because such argument reinforces the notion that the penalty decision must be an individual determination under the instructions given by the court. (*People v. Hughes, supra,* 27 Cal.4th at p. 392; *People v. Bradford, supra,* 14 Cal.4th at p. 1063; *People v. Jackson* (1996) 13 Cal.4th 1164, 1242 [56 Cal.Rptr.2d 49, 920 P.2d 1254]; *People v. Arias, supra,* 13 Cal.4th at p. 180.) Prosecutors also may point to the Bible as demonstrating "historical acceptance of capital punishment." (*People v. Zambrano, supra,* 41 Cal.4th at p. 1169, citing *People v. Williams* (1988) 45 Cal.3d 1268, 1325 [248 Cal.Rptr. 834, 756 P.2d 221].)

In the present case, the prosecutor's biblical references strayed beyond the bounds of permissible argument based upon religion. Her argument was framed to dispel any concern that religious precepts forbade the penalty of death, but she plainly invoked a religious justification for the death penalty by stating "[t]he Bible unambiguously commands that murderers be put to death." This comment was followed quickly by quotations from scripture that, taken together, suggested that the Bible, far from forbidding capital punishment, actually endorsed capital punishment for murder. These statements could have suggested "that another, higher law should be applied" during the jury's penalty deliberation (*People v. Wrest, supra,* 3 Cal.4th at p. 1107), threatening to displace the court's instructions in the minds of jurors. As such, they amount to prosecutorial misconduct.

The Attorney General contends that no misconduct occurred, because "[t]he Biblical reference was made simply to ensure that any religious jurors would *not* apply a higher law in a mistaken belief that the higher law forbade imposition of the death penalty." We are unpersuaded. Although we agree that the prosecutor framed her religious comments as an ostensible exhortation for jurors to refrain from deciding *against* the death penalty based upon religious views, the content of her remarks emphatically communicated that the Bible *supports* imposition of the death penalty. She "urged that the Bible not only permits such action, but demands it." (*People v. Zambrano, supra,* 41 Cal.4th at p. 1170.) Similarly framed arguments have been held improper. (*People v. Vieira, supra,* 35 Cal.4th at pp. 297–298; *People v. Slaughter, supra,* 27 Cal.4th at p. 1210.)

Although we find that the prosecutor erred, the error in this instance was not prejudicial. Under California law, and in the context of capital sentencing, reversal for prosecutorial misconduct requires prejudice manifested by a reasonable possibility of an effect on the outcome. (*People v. Riggs* (2008) 44 Cal.4th 248, 315 [79 Cal.Rptr.3d 648, 187 P.3d 363]; *People v. Dykes, supra,* 46 Cal.4th at p. 793; *People v. Wallace, supra,* 44 Cal.4th at p. 1092.) Even assuming, without deciding, that defendant's claim with respect to establishment of religion includes an assertion of federal constitutional error, reversal under the federal Constitution also requires prejudice, although prejudice "is presumed unless the government shows that the defect was harmless beyond a reasonable doubt." (*People v. Roybal, supra,* 19 Cal.4th at p. 520, citing *Rose v. Clark* (1986) 478 U.S. 570, 576–579 [92 L.Ed.2d 460, 106 S.Ct. 3101].)

It is not reasonably possible that a result more favorable to defendant would have been reached in the absence of the prosecutor's religious references, in light of the clear guidance afforded to the jury by the court's instructions, the brevity of the challenged remarks in comparison to the prosecutor's careful and extended discussion of the statutory factors, and the overwhelming nature of the factors in aggravation, including the heinous facts underlying both the charged crime and the prior conviction for rape. (See, e.g., *People v. Abilez* (2007) 41 Cal.4th 472, 527 [61 Cal.Rptr.3d 526, 161 P.3d 58]; *People v. Lewis and Oliver, supra,* 39 Cal.4th at p. 1060; *People v. Roybal, supra,* 19 Cal.4th at p. 521; *People v. Zambrano, supra,* 41 Cal.4th 1082, 1170; *People v. Samuels* (2005) 36 Cal.4th 96, 134 [30 Cal.Rptr.3d 105, 113 P.3d 1125]; *People v. Vieira, supra,* 35 Cal.4th at p. 298; *People v. Slaughter, supra,* 27 Cal.4th at pp. 1210–1211; *People v. Hughes, supra,* 27 Cal.4th at p. 392; *People v. Wash, supra,* 6 Cal.4th at p. 261; *People v. Wrest, supra,* 3 Cal.4th at p. 1107.)

### 3. *Instruction on the Governor's Commutation Power*

During deliberations at the penalty phase of the trial, the jury posed a two-part question to the trial court: "Part One: When the defendant is given the death sentence, can the Governor or anyone else overturn and/or overrule the decision thus giving the defendant opportunity for parole[?] [¶] Part Two: When the defendant is given a life without the chance of parole . . . can the Governor or anyone else overturn and/or overrule the decision thus giving the defendant an opportunity for parole?"

The court noted for the record that counsel and the court had conferred and agreed that the court would inform the jury that the Governor's commutation power applies to both sentences, but that it would be a violation of a juror's responsibilities for the jury to consider commutation. The court denied

defense counsel's request that the trial court further instruct the jury that "life without possibility of parole means exactly that." The court instructed the jury: "The Governor's commutation power[] applies to both sentences, to wit, one death or two life without the possibility of parole. [It would] [b]e a violation of your duty as a juror to consider the possibility of such commutation in determining the appropriate sentence."

Defendant contends the court's instruction was prejudicially incomplete and inaccurate, because it failed to inform the jury that the Governor may not commute a sentence of a twice-convicted felon without the recommendation of four concurring justices of this court (Cal. Const., art. V, § 8, subd. (a)), even though defendant's 1981 and 1983 convictions rendered him subject to this limitation of the Governor's power, and because the instruction suggested that the method for commutation was simpler and "more likely to happen" than experience would suggest. We consistently have rejected similar claims.[9] "A trial court in a capital case does not err when it answers a jury question generally related to the commutation power by instructing that the Governor may commute either a death sentence or a life without possibility of parole sentence, but that the jury must not consider the possibility of commutation in determining the appropriate sentence." (*People v. Bramit, supra,* 46 Cal.4th at p. 1246.) The absence of an instruction explaining the limitations upon the Governor's power to commute sentences of twice-convicted felons ordinarily is insignificant, "because the specific details of the commutation process [bear] no relevance to the jury's task . . . ." (*People v. Beames* (2007) 40 Cal.4th 907, 933 [55 Cal.Rptr.3d 865, 153 P.3d 955]; see also *People v. Bramit, supra,* 46 Cal.4th at p. 1247 ["there is no reason to mention the restrictions on the Governor's power of commutation because they are irrelevant to the jury's determination, and there is good reason not to stress a defendant's record"]; *People v. Hart* (1999) 20 Cal.4th 546, 656–657 [85 Cal.Rptr.2d 132, 976 P.2d 683] [rejecting the view that any incompleteness in the instruction is "constitutionally deficient under the federal constitutional standard established in *California v. Ramos* (1983) 463 U.S. 992, 1010–1012 [77 L.Ed.2d 1171, 103 S.Ct. 3446], or that the omission, even if error, was prejudicial under the *Chapman* [*v. California* (1967) 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824]] standard"].)

We remain unpersuaded by defendant's claim that an instruction to disregard the possibility of commutation cannot be followed by a jury that has expressed concern regarding the possibility of the defendant's release. (See *People v. Bramit, supra,* 46 Cal.4th at p. 1246; *People v. Beames, supra,* 40 Cal.4th at p. 933.) As in prior decisions, we decline to reconsider our

---

[9] We need not reach the question whether this claim of error was forfeited or error was invited, because it is clear no error occurred. (See *People v. Bramit, supra,* 46 Cal.4th at pp. 1246–1247.)

rejection of this claim in light of contrary suggestions contained in *Coleman v. Calderon* (9th Cir. 1998) 150 F.3d 1105 and *Coleman v. Calderon* (9th Cir. 2000) 210 F.3d 1047, 1050–1051. (*People v. Bramit, supra*, 46 Cal.4th at p. 1247; *People v. Martinez* (2003) 31 Cal.4th 673, 698 [3 Cal.Rptr.3d 648, 74 P.3d 748].) We have explained: "To the contrary, the jury was admonished that considering the possibility of commutation would be a violation of its oath. Absent any contrary indication, we presume the jury followed the instruction." (*People v. Bramit, supra*, 46 Cal.4th at p. 1247.)

■ We also have rejected defendant's suggestions that when the prosecutor raises the prospect of the defendant's future dangerousness, further instruction on parole and the Governor's commutation power is constitutionally required (*People v. Marlow* (2004) 34 Cal.4th 131, 153–154 [17 Cal.Rptr.3d 825, 96 P.3d 126]), and that language such as was given in the present case leaves the jury with a false impression regarding the defendant's prospects for parole, in violation of the teaching of *Simmons v. South Carolina* (1994) 512 U.S. 154 [129 L.Ed.2d 133, 114 S.Ct. 2187] (*People v. Harris* (2008) 43 Cal.4th 1269, 1316–1317 [78 Cal.Rptr.3d 295, 185 P.3d 727] [the pattern instructions adequately explain the meaning of life in prison without possibility of parole]; see also *People v. Martinez, supra*, 31 Cal.4th at p. 699).

Defendant contends that the assertedly incomplete and inaccurate instruction caused the jury to believe that the ultimate decision over sentence rested with the Governor and not with the jury, but, as we have explained, the jury properly was instructed to disregard the question of commutation. (See *People v. Martinez, supra*, 31 Cal.4th at p. 699.) We decline to reconsider our previous decisions.

### 4. *Challenges to California's Death Penalty Scheme*

Defendant raises a number of claims that we have rejected in prior decisions, but does not provide a convincing basis for reconsideration.

Section 190.2 is not impermissibly overbroad in violation of the Fifth, Sixth, Eighth, or Fourteenth Amendments to the federal Constitution. (*People v. Dykes, supra*, 46 Cal.4th at p. 813.) Specifically, the number of special circumstances is not so high as to fail to perform the constitutionally required narrowing function; the special circumstances are not overinclusive, either on their face or as interpreted by this court; and the felony-murder special circumstance is not invalid for failing to narrow meaningfully the class of persons eligible for the death penalty. (*Ibid.*; *People v. Jenkins, supra*, 22 Cal.4th at p. 1050.)

Section 190.3, factor (a) is not impermissibly vague in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, because, in defendant's view, the specified factor (the "circumstances of the crime") has been applied in a "wanton and freakish" manner so that "every feature of any murder, even features at odds with those of other murders, have been found to be 'aggravating' within the statute's meaning." (See *People v. Brasure* (2008) 42 Cal.4th 1037, 1066 [71 Cal.Rptr.3d 675, 175 P.3d 632].)

Contrary to defendant's claim, it is not constitutionally required that the jury be instructed to apply the beyond-a-reasonable-doubt standard to sentencing factors or to find beyond a reasonable doubt that death is the appropriate penalty, and there is no statutory or constitutional requirement that aggravating circumstances outweigh mitigating circumstances beyond a reasonable doubt in order for the jury to return a verdict of death. (*People v. Brasure, supra*, 42 Cal.4th at p. 1067.) The high court's decisions in *Apprendi v. New Jersey, supra*, 530 U.S. 466, and *Ring v. Arizona, supra*, 536 U.S. 584, do not alter this conclusion. (*People v. Bramit, supra*, 46 Cal.4th at p. 1249 & fn. 22.) In addition, the California death penalty scheme is not constitutionally flawed either by its failure to require written jury findings on the existence of aggravating factors or as to aggravating factors outweighing mitigating circumstances, or by its failure to require jury unanimity concerning the existence of aggravating factors. (*People v. Dykes, supra*, 46 Cal.4th at p. 813.)

Intercase proportionality review is not constitutionally required. (*People v. Dykes, supra*, 46 Cal.4th at p. 813.) Neither the equal protection clause nor the due process clause requires that the same disparate-sentence review be applied to noncapital and capital cases. (*People v. Crittenden* (1994) 9 Cal.4th 83, 156 [36 Cal.Rptr.2d 474, 885 P.2d 887].)

There is no constitutional requirement that, in instructing on circumstances in aggravation and mitigation, the court omit assertedly "irrelevant" factors. (*People v. Anderson* (2001) 25 Cal.4th 543, 600 [106 Cal.Rptr.2d 575, 22 P.3d 347].)

The use of the terms "extreme" and "substantial," in connection with section 190.3, factors (d) and (g), does not render unconstitutional the consideration of evidence in mitigation. (*People v. Martinez, supra*, 47 Cal.4th at p. 455.) In addition, the temporal references in section 190.3, factors (d) and (h) (consideration of any "extreme mental or emotional disturbance," or "impairment" as a result of "mental disease or defect, or the [e]ffects of intoxication," at the time of the offense) "[do] not preclude the jury from considering any such evidence merely because it did not relate specifically to

defendant's culpability for the crimes committed." (*People v. Hughes, supra,* 27 Cal.4th at p. 405, fn. 33.)

The trial court did not err in failing to specify which statutory factors could be considered solely in mitigation. (*People v. Catlin* (2001) 26 Cal.4th 81, 178 [109 Cal.Rptr.2d 31, 26 P.3d 357].)

### 5. *Pattern Instruction CALJIC No. 8.88*

Pattern instruction CALJIC No. 8.88 (CALJIC former No. 8.84.2) is not constitutionally flawed because the term "so substantial" assertedly is vague or the term "warrants" is overly broad (*People v. Arias, supra,* 13 Cal.4th at p. 171), nor is the instruction defective in failing to inform the jury of the full range of potentially mitigating circumstances (*People v. Dykes, supra,* 46 Cal.4th at p. 817).

### 6. *Cumulative Prejudice*

Defendant has not demonstrated the existence of error that cumulatively establishes prejudice, either at the guilt phase or the penalty phase of his trial.

## III. DISPOSITION

For the foregoing reasons, the judgment is affirmed in its entirety.

Kennard, J., Baxter, J., Werdegar, J., Chin, J., Moreno, J., and Corrigan, J., concurred.

Appellant's petition for a rehearing was denied August 18, 2010, and the opinion was modified to read as printed above.